773 So.2d 1065 (2000)
Albert HOLLAND, Appellant,
v.
STATE of Florida, Appellee.
No. SC89922.
Supreme Court of Florida.
October 5, 2000.
Rehearing Denied December 20, 2000.
*1068 Richard L. Jorandby, Public Defender, and Richard B. Greene, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Sara D. Baggett, Assistant Attorney General, West Palm Beach, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Albert Holland. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. For the reasons stated below, we affirm the convictions and sentences, including the sentence of death.
Holland was convicted and sentenced to death for the 1990 murder of Pompano Beach police officer Scott Winters. On appeal, this Court reversed Holland's conviction due to the erroneous admission of expert medical testimony concerning an examination of Holland by a State psychiatrist. See Holland v. State, 636 So.2d 1289 (Fla.1994). The examination took place in violation of Holland's right to counsel and right to remain silent. See id. at 1292-93.
The record from the retrial establishes the following facts. Holland attacked a woman he met on July 29, 1990. Holland ran off after a witness interrupted the attack. Police officers responding to a call about the attack found the woman semiconscious with severe head wounds. Officer Winters and other officers began searching for the man believed to have been involved in the attack. A short time later, witnesses saw Officer Winters struggling with Holland. During the struggle, Holland grabbed Officer Winters' gun and shot him. Officer Winters died of gunshot wounds to the groin and lower stomach area.
The jury convicted Holland of first-degree murder, armed robbery, attempted sexual battery, and attempted first-degree murder. The jury recommended by an eight-to-four vote that Holland be sentenced to death. The trial court found the following aggravating circumstances: (1) the defendant was previously convicted of a felony involving the use or threat of violence to a person; (2) the capital felony was committed while the defendant was engaged in the commission of, or in an attempt to commit, or flight after committing or attempting to commit the crime of robbery or an attempt to commit the crime of sexual battery or both; and (3)(a) the crime was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, merged with (3)(b) the victim of the capital felony was a law enforcement officer engaged in the performance of his legal duties. The court did not find that any statutory mitigating circumstances were established, but did find the existence of two nonstatutory mitigating circumstances: (1) history of drug and alcohol abuse (little weight) and (2) history of mental illness (little weight). The trial court concluded that the aggravators outweighed the mitigators and sentenced Holland to death.
Holland raises twenty-two claims in this appeal.[1] We address the guilt-phase issues *1069 first. In issue one, Holland claims that the trial court erred in denying him the opportunity to represent himself. The trial court conducted Faretta[2] inquiries on at least two separate occasions to determine whether Holland was competent to represent himself. At the conclusion of the inquiries, the trial court denied Holland's request for self-representation.
As Holland points out, "a person need not be schooled in the law in order to competently elect to represent himself." Crystal v. State, 616 So.2d 150, 153 (Fla. 1st DCA 1993). See also Fla. R.Crim. P. 3.111(d)("(3) Regardless of the defendant's legal skills or the complexity of the case, the court shall not deny a defendant's unequivocal request to represent him or herself, if the court makes a determination of record that the defendant has made a knowing and intelligent waiver of the right to counsel."). However, in Johnston v. State, 497 So.2d 863, 868 (Fla.1986), this Court stated that "[i]n determining whether a defendant has knowingly and intelligently waived his right to counsel, a trial court should inquire into, among other things: defendant's age, mental status, and lack of knowledge and experience in criminal proceedings." In Johnston, this Court concluded that "[t]he trial judge made the proper inquiry ... and correctly concluded that the desired waiver of counsel was neither knowing nor intelligent, in part, because of Johnston's mental condition." Id. (emphasis added). See also Visage v. State, 664 So.2d 1101, 1101 (Fla. 1st DCA 1995).
A trial court's decision as to self-representation is reviewable for abuse of discretion. See id. at 1101. We conclude that the trial court did not abuse its discretion in denying Holland the right to represent himself. The record contains numerous instances of Holland's unstable mental condition, particularly his previous hospitalization at St. Elizabeth's. Additionally, the trial court was aware of the potential that Holland was going to rely on the insanity defense. Moreover, it is clear from Holland's responses to the trial court's inquiries that Holland lacked sufficient knowledge of criminal proceedings:
THE COURT: Tell me in simple terms what legal or other training you have that would assist you to represent yourself in proceedings of this nature.
THE DEFENDANT: Well, from what I've seen in the evidence, Ray Charles could come in here and represent himself and Stevie Wonder, so I don't need too much legal training to do all that.
. . . .
THE COURT: Any training you've had, any books that you've read?
THE DEFENDANT: No.
THE COURT: Any anything?
THE DEFENDANT: No, but what I'm trying to tell you is, you know, I won't [be] violating any rules in here. I won't be disruptive.

*1070 THE COURT: Do you know the rules that you could violate?
THE DEFENDANT: No, but I'm just saying common things thatdon't interrupt people, something like that.
Weeks later, when the trial court conducted another Faretta inquiry, Holland told the court that he would know when to object based on what he learned from watching "Matlock" on television. Finally, the following passage from the record best describes the trial court's reasons for denying Holland's requests to represent himself:
Mr. Holland originally, in 1990, filed a defense, when Mr. Giacoma and Mr. Tindall were representing him, of insanity and that was a defense which was used at trial. After this case was remanded for [a] new trial Mr. Delegal initially, and then Mr. Lewis and Mr. Baron, again relied on the defense of insanity.
Obviously, this is an issue that this Court must address in making determinations of how Mr. Holland is to proceed.
Mr. Holland on numerous occasions has indicated that he would rather represent himself. I believe it was on ... July 25th this Court conducted a Faretta Inquiry. And the Court has had previous dialogue with Mr. Holland regarding his abilities, one to understand what is taking place and the seriousness of the charges. And certainly, I believe Mr. Holland is aware that he faces the possibility of the imposition of the death penalty.
The Court discussed with Mr. Holland the factors of his childhood, which the Court is aware from prior hearings, the facts from prior hearings.
Mr. Holland has suffered an injury to the head and was hospitalized at Saint Elizabeth's in Washington D.C. while he was incarcerated approximatelycorrect me if I'm wrongten, twelve years ago, approximately; is that right?
He has indicated that he has obtained a GED since he has been incarcerated. Mr. Holland has obviously sat through his prior first degree murder trial, but that is not exactly correct, because due to Mr. Holland's behavior Mr. Holland was removed from that courtroom and watched that proceeding on closed-circuit television.
So Mr. Holland has previously demonstrated, before Judge Futch in his prior trial of this case, his inability to follow the Court's orders and decorum required to be in a courtroom.
. . . .
Mr. Holland is still, from my understanding of the pleadings that are in this case, relying on the defense of insanity. I believe that touches upon his mental condition and ability to understand the nature as well as the complexity of this case.
Based on this excerpt, it is clear that the trial court properly applied the Johnston factors in denying Holland the right to represent himself. Hence, we find no merit to Holland's first claim of error.
In issue two, Holland alleges that the trial court gave an erroneous jury instruction regarding the necessary intent that is required to establish felony murder (based on attempted sexual battery) and attempted sexual battery. Holland also claims that the court erred when it refused to give the voluntary intoxication instruction. The trial court read the following instruction to the jury:
In order to convict of First Degree Felony Murder, it is not necessary for the State to prove that the defendant had a premeditated design or intent to kill. It is also not necessary for the State to prove that the defendant had a specific intent to commit a sexual battery in order for you to find that the death of Scott Winters occurred as a consequence of and while the defendant was engaged in, or attempting to commit, or while escaping from the immediate scene of the sexual battery, since specific intent *1071 is not an element of the offense of sexual battery.
Holland claims that in Rogers v. State, 660 So.2d 237 (Fla.1995), this Court held that attempted sexual battery was a specific intent crime, thereby making the jury instruction in his case erroneous. In Rogers, this Court stated:
Our statute defines sexual battery as "oral, anal, or vaginal penetration by, or union with, the sexual organ of another or by anal or vaginal penetration of another by any other object." § 794.011(1)(h), Fla. Stat (1989). To establish attempt, the State must prove a specific intent to commit a particular crime and an overt act toward the commission of that crime. Thomas v. State, 531 So.2d 708, 710 (Fla.1988).
Id. at 241 (emphasis added). For this same reason, Holland claims that the court should have given the voluntary intoxication instruction. See Linehan v. State, 476 So.2d 1262, 1264 (Fla.1985) (recognizing that voluntary intoxication is a defense to specific intent crimes).
We recognize that there has been some confusion in the law regarding the crime of attempt. Our cases have been less than clear regarding whether the crime of attempt is a general intent or specific intent crime. See Rogers; Gudinas v. State, 693 So.2d 953, 962 (Fla.1997) (quoting the definition of attempt from Rogers). But see Sochor v. State, 619 So.2d 285, 290 (Fla.1993) (stating that attempted sexual battery is a general intent crime); Sochor v. State, 580 So.2d 595, 601 (Fla.1991) (same). However, in Brown v. State, No. SC95844, ___ So.2d ___, 2000 WL 1472598 (Fla. Oct.5, 2000), this Court concluded that the crime of attempted second-degree murder does exist in Florida. In that case, we referred to our previous opinion in Gentry v. State, 437 So.2d 1097, 1098-99 (Fla.1983), where we provided the following test for determining whether an attempt is a specific intent or a general intent crime:
We now hold that there are offenses that may be successfully prosecuted as an attempt without proof of a specific intent to commit the relevant completed offense. The key to recognizing these crimes is to first determine whether the completed offense is a crime requiring specific intent or general intent. If the state is not required to show specific intent to successfully prosecute the completed crime, it will not be required to show specific intent to successfully prosecute an attempt to commit that crime.
Applying the Gentry test to the present case, we find that the trial court did not err in refusing to give the voluntary intoxication instruction. Sexual battery is a general intent crime. See Buford v. State, 492 So.2d 355, 359 (Fla.1986). Thus, under Gentry, attempted sexual battery is also a general intent crime. The voluntary intoxication instruction is only applicable to specific intent crimes. See Linehan, 476 So.2d at 1264. Therefore, there is no merit to this claim.
We address issues three and four together. In issue three, Holland asserts the trial court abused its discretion in denying Holland's motion to exclude the testimony of the State's mental health experts. As pointed out above, after the first trial in this case, this Court reversed for a new trial due to the improper admission of Dr. Strauss' testimony in violation of Holland's right to counsel and right to remain silent. In issue three Holland alleges that the State gave Dr. Strauss' report to Dr. Kaprowski, who subsequently testified during the second trial regarding Holland's sanity, and to Dr. Block-Garfield, who testified at the competency hearing. In issue four, Holland argues that the trial court erred in failing to disqualify state attorney Michael Satz and the state attorney's office because Satz and his office had knowledge concerning Dr. Strauss' report and this report may have provided the State an "investigative lead."
To support these claims, Holland relies on Kastigar v. United States, 406 U.S. 441, *1072 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In Kastigar, the United States Supreme Court held that the government can compel testimony from an unwilling witness by conferring immunity from the use of the compelled testimony and evidence derived therefrom in subsequent criminal proceedings (use and derivative use immunity). See id. at 448, 92 S.Ct. 1653. The Court added that in a subsequent criminal prosecution, the government has the burden of establishing that the evidence it proposes to use is derived from a source wholly independent of the compelled testimony. See id. at 460, 92 S.Ct. 1653.
We do not find Kastigar to be analogous to the present case. This is not a case where the state attorney's office granted a defendant use immunity in exchange for testimony and later proceeded to charge that defendant with a crime. Therefore, Kastigar does not apply, as the underlying reasons for requiring the prosecution to establish an independent source for evidence are not implicated in the present case.
Further, we find no merit to Holland's claim that the experts' reliance on Dr. Strauss' report violated his right to counsel and right to remain silent. Holland failed to present any evidence at the motion hearing to establish that Dr. Kaprowski relied on Dr. Strauss' report. Further, Dr. Block-Garfield testified at the motion hearing that she never spoke to Dr. Strauss nor did she review or rely upon Dr. Strauss' report. Thus, the taint from Dr. Strauss' report did not extend to Dr. Block-Garfield's testimony. Therefore, it was not error to permit the two doctors to testify.
Moreover, we find no error in the trial court's refusal to disqualify Satz and the state attorney's office. Holland has failed to demonstrate actual prejudice that would require disqualification. See Farina v. State, 679 So.2d 1151, 1157 (Fla.1996), receded from on other grounds, Franqui v. State, 699 So.2d 1312, 1320 (Fla.1997).
In issue five, Holland claims that the trial court abused its discretion in denying Holland's motion to redepose certain witnesses. To support this argument, Holland points out that the defense attorney during the retrial was not the same attorney that handled the initial trial. Holland argues that the retrial attorney should not be bound by the strategy used by the first attorney and that the retrial attorney needed to ask different questions of some of the witnesses.
Florida Rule of Criminal Procedure 3.220(h)(1) states that "[i]n any case, including multiple defendants or consolidated cases, no person shall be deposed more than once except by consent of the parties or by order of the court issued on good cause shown." The fact that there was a retrial in this case with a different attorney does not, by itself, amount to "good cause." Therefore, we find no merit to this claim.
In issue six, Holland alleges that the trial court abused its discretion in overruling Holland's objections to the admissibility of a videotape of the interrogation of Holland. Holland moved to suppress the videotape because the tape was mostly inaudible. The State argued that the videotape was being offered to show Holland's demeanor during the interrogation. The trial court subsequently permitted the introduction of the videotape. We agree with Holland that the tape should not have been admitted.
Through no fault of the defendant, the jury was unable to hear most, if not all, of the defendant's responses due to the poor quality of the tape. Yet, the jury was able to hear most of the questions that were asked by the interrogating detective. This allowed the jury to speculate what the defendant's answers were to these questions, a result which was prejudicial to the defendant. The State directs our attention to Odom v. State, 403 So.2d 936, 940 (Fla. 1981), where this Court stated that "[p]artial inaudibility or unintelligibility is not a *1073 ground for excluding a recording if the audible parts are relevant, authenticated, and otherwise properly admissible." However, we believe that the language in Odom is distinguishable from the present case. In Loren v. State, 518 So.2d 342, 352 n. 4 (Fla. 1st DCA 1987), the First District Court of Appeal stated that "Florida courts have followed the general rule that... recordings are admissible unless the inaudible and unintelligible portions are so substantial as to deprive the remainder of relevance." The inaudible portions of the tape in the present case, which encompassed most, if not all, of Holland's statements, are so substantial as to deprive the remainder of relevance. As a result, we hold that the trial court erred in admitting the videotape. Nevertheless, we find this error harmless because the interrogating detective properly testified regarding what Holland said to him during the interrogation. We conclude beyond a reasonable doubt that the error in admitting the tape did not affect the jury verdict. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
In issue seven, Holland asserts that the trial court abused its discretion in denying his motion to suppress his statements to the police. After Holland was arrested, the police obtained his name and his fingerprints. The police also attempted to interview Holland, but when he was initially read his Miranda rights, he invoked his right to counsel, and therefore the interview ceased. As the police began to process the case over the next couple of hours, they discovered that Holland had given a false name, for his fingerprints did not match the name he gave the police. Therefore, Detective Butler went to Holland's cell to ask him his real name. After Holland gave him his real name, Detective Butler presented his card to Holland and said, "[I]f you want to talk to me, you can call me." Later, Holland asked to talk to Detective Butler and subsequently discussed the details of the crime. Holland claims that Detective Butler undermined Holland's right to counsel by giving Holland his card and extending an invitation to talk.
In support of his claim, Holland relies on Zeigler v. State, 471 So.2d 172 (Fla. 1st DCA 1985). In Zeigler, the defendant invoked his right to counsel at the time of his arrest, and questioning ceased. However, while the defendant was being transported from Quincy to Jacksonville, a detective made the following statements to the defendant:
I pulled up behind the Duval County Jail and told them [sic] him that this was the county jail, that if he wanted to make a statement or say anything he could at this time because there wasn't going to be no tomorrow, the ballgame was over, he was going to be booked in jail. And he made the return comment thatas I recall, you boys or you guys have been good to me, let's go to the office and I'll tell you what you want to know. And then we drove over underneath the Police Memorial Building and went to an interview room at the homicide division.
Id. at 174. The defendant subsequently gave a statement to the police. The trial court denied the defendant's motion to suppress the statement. On appeal, the district court reversed, finding that the detective's statement amounted to an interrogation which was not initiated by the defendant. See id.
We find the facts of Zeigler distinguishable from the present case. In State v. Foster, 562 So.2d 808, 810 (Fla. 5th DCA 1990), the Fifth District Court of Appeal made the following observations:
The protective nature of Miranda warnings concerns investigative interrogation. We do not think Miranda applies to questions designed to obtain basic identifying data as routinely occurs at bookings or arraignments. State v. McAdams, 559 So.2d 601 (Fla. 5th DCA 1990); Esposito v. Adams, 700 F.Supp. 1470, 1479 (N.D.Ill.1988). Miranda warnings are not required outside the context of an inherently coercive custodial interrogation.
*1074 Similarly, in Avila v. State, 545 So.2d 450, 451 (Fla. 3d DCA 1989), the Third District Court of Appeal concluded that a question aimed at discovering the real name of a defendant is not an interrogation within the scope of Miranda.
The purpose of Detective Butler's contact with Holland was to ascertain his real name. In fact, Detective Butler specifically told Holland that he did not want to talk to him about the case because he had asked for an attorney and that the only reason he came to see Holland was to find out his real name. The record is clear that it was Holland, not Detective Butler, who initiated the conversation which ultimately resulted in the confession. Holland specifically asked Detective Butler, "Can I talk to you?" After Detective Butler escorted Holland to the interview room, Detective Butler again informed Holland of his Miranda rights. Detective Butler specifically reminded Holland that he had previously asked for an attorney and clarified that Holland was willing to talk without an attorney present. Holland responded by saying, "I'll talk to you," and proceeded to sign the waiver of Miranda rights form. Based on the foregoing, we find no error.
In issue eight, Holland argues that the trial court abused its discretion in allowing the admission of Dr. Tate's prior testimony. Dr. Tate was the medical examiner in this case. Dr. Tate testified during the first trial but retired shortly thereafter in order to sail around the world. The State, therefore, alleged at the second trial that Dr. Tate was unavailable. The State made numerous unsuccessful attempts to contact Dr. Tate. After conducting a hearing on this issue, the trial court permitted Dr. Tate's previous testimony to be introduced.
In Thompson v. State, 619 So.2d 261, 265 (Fla.1993), this Court provided the following guidelines for permitting the introduction of prior testimony:
In his first claim, Thompson alleges that his rights of confrontation and due process were denied him when the trial court allowed the prior testimony of Barbara Savage to be read to the jury. Thompson asserts that the State failed to show due diligence in its attempt to locate the witness and that, due to the witness's last-minute unavailability, he was denied the opportunity to obtain the witness himself. The record shows that the State had filed affidavits to secure an out-of-state witness according to chapter 942, Florida Statutes (1987), had contacted the witness's former employers, and had issued a subpoena which was returned unserved.
The use of prior testimony is allowed where (1) the testimony was taken in the course of a judicial proceeding; (2) the party against whom the evidence is being offered was a party in the former proceeding; (3) the issues in the prior case are similar to those in the case at hand; and (4) a substantial reason is shown why the original witness is not available. The record reflects that the prior testimony met all of these criteria.
Thompson also asserts that, because the cross-examination of Barbara Savage at the first trial was brief and he did not have the opportunity to examine her in these proceedings, his right of confrontation under the Florida and United States Constitutions was violated. We find that all that is required is that the party have an opportunity at the prior proceeding to cross-examine the witness. Because Thompson's cross-examination of the witness in the first trial was brief, his right of confrontation in this second sentencing proceeding is not constitutionally impaired. We conclude that the trial court did not err in declaring the witness unavailable.
(Citations omitted.) After reviewing the record in this case, we find that the State satisfied the Thompson criteria.
In issue nine, Holland claims that the trial court abused its discretion in denying Holland's motion for judgment of acquittal as to the premeditation element *1075 of first-degree murder. "[A] motion for judgment of acquittal should not be granted unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law." Davis v. State, 703 So.2d 1055, 1059 (Fla.1997). Holland points out that witness Dorothy Home testified that neither Officer Winters nor Holland had control over the gun. However, witness Betty Bouie testified that Holland took the gun from Officer Winters and shot him. Witness Nikki Home testified that she saw a police officer and a man struggling and "the man took the policeman's gun from the side and the gun went off three times." Witness Parish Home testified that he saw Holland reach around the officer and take the gun from the officer's holster and then shoot the officer. Finally, witness Abraham Bell testified that during the struggle, he saw Holland repeatedly try to grab the officer's gun, and when he finally freed the gun from the holster, Holland shot the officer twice and then ran. Based on all of this testimony, the trial court did not err in denying the motion.
In issue ten, Holland alleges that the trial court abused its discretion in denying Holland's objections to certain testimony regarding where Officer Winters' gun was found. The gun was located between some rocks in a field near the murder scene. Dr. Martell, a mental health expert, was called by the State to rebut Holland's defense of insanity. Dr. Martell testified that it was his opinion from looking at the photograph of the location where the gun was found that the gun was hidden by Holland and not randomly dropped. After the defense objected, the State further questioned Dr. Martell:
Q (by the State): Doctor, let me ask you a question with reference to the gun; did you see any photographs of the gun?
A (by Dr. Martell): I did.
Q: Okay, and how did it appear to you?
A: It was clear to me, from looking at the location where the gun was found, that a gun would not end up in that place in that position, randomly. It had to be placed there.
Q: That's your opinion?
A: That's my opinion.
Holland argues that the trial court erred in admitting this testimony because Dr. Martell had no expertise which would qualify him to testify as to whether a gun was placed or randomly dropped. We agree.
"A trial court has broad discretion in determining the range of subjects on which an expert witness can testify, and, absent a clear showing of error, the court's ruling on such matters will be upheld." Finney v. State, 660 So.2d 674, 682 (Fla. 1995). However, in Gilliam v. State, 514 So.2d 1098, 1100 (Fla.1987), this Court concluded that a medical examiner should not have been allowed to testify regarding whether certain marks left on the decedent's body were caused by a sneaker found at the scene:
An expert witness may testify only in his or her area of expertise. An expert opinion must not be based on speculation, but on reliable scientific principles. See Delap v. State, 440 So.2d 1242 (Fla. 1983). This medical examiner was not qualified as an expert in shoe patterns. Her testimony was neither reliable nor scientific and should not have been allowed.
See also Goodyear Tire & Rubber Co. v. Ross, 660 So.2d 1109, 1111 (Fla. 4th DCA 1995) ("We agree that it is not enough that the witness be qualified to propound opinions on a general subject; rather he must be qualified as an expert on the discrete subject on which he is asked to opine.").
In the present case, Dr. Martell was not qualified as an expert in crime scene evidence. Therefore, the trial court should not have allowed Dr. Martell to give his opinion as to whether the gun was placed or randomly dropped. Nevertheless, we conclude beyond a reasonable doubt that this error did not affect the jury verdict. See DiGuilio. Prior to Dr. *1076 Martell's testimony, the State had already presented the testimony of Deputy McDonald, who found the gun the day after the murder. Deputy McDonald testified that he believed that the gun was placed between the rocks and not dropped. This testimony was given without objection.
After reviewing all of the evidence in the record, we find that there is competent, substantial evidence to support Holland's convictions of first-degree murder, armed robbery, attempted sexual battery, and attempted first-degree murder.
Next, we turn to the penalty phase issues. In issue eleven, Holland asserts that the trial court erred in rejecting as a nonstatutory mitigator that Holland had two prior adjudications of insanity in Washington, D.C. Holland argues that the trial court improperly relied on the sanity standard to reject this mitigator. To support this argument, Holland cites to Campbell v. State, 571 So.2d 415 (Fla.1990), which he claims held that the sanity standard cannot be used to reject mental mitigators. However, in Campbell, the mitigator that was rejected was impaired capacity. In contrast, the trial court in the present case properly relied on the sanity standard because the mitigator in question is Holland's previous adjudication of insanity. The trial court correctly pointed out that Washington, D.C., has a different standard of insanitya relevant analysis for this mitigator. Further, the trial court found as a nonstatutory mitigator that Holland had a history of mental illness. Thus, there is no merit to this issue.
We address issues twelve and thirteen together. In issue twelve, Holland argues that the record does not support the trial court's findings regarding the testimony of Dr. Polley and Dr. Patterson concerning the mental mitigators. In issue thirteen, Holland claims that the trial court erred in rejecting the "extreme mental or emotional disturbance" mitigator.
In Rose v. State, 617 So.2d 291, 293 (Fla.1993), this Court stated that "[t]he trial court has broad discretion in determining the applicability of mitigating circumstances and may accept or reject the testimony of an expert witness." We conclude that the trial court did not abuse its discretion in determining the applicability of the mitigators in this case. Contrary to Holland's claims, all of the trial court's findings are supported by the record. For instance, the trial court made the following findings in its sentencing order:
The Bender Gestalt, Weschler Adult Intelligence and Memory Scale and Rorschach tests indicated that there was a logical flow to the defendant's thoughts, that there was no evidence of loose or tangential thinking, no impairment of his remote or recent memory and no evidence of psychosis or overt psychosis.
Holland claims that Dr. Polley did in fact testify that the Rorschach test demonstrated that there was evidence of psychosis. Although Dr. Polley testified that the Rorschach test showed an underlying psychotic process that was not evidenced on the surface of Holland's presentation, he also stated that there was no overt psychosis. Thus, the trial court's conclusions were in fact supported by the record. Because there has been no showing that the trial court abused its discretion, we find no merit to these claims.
In issue fourteen, Holland alleges that the trial court failed to consider the following nonstatutory mitigators: (1) little or no premeditation; (2) Holland's drug use at the time of the offense; (3) the traumatic effect on Holland of nearly being beaten to death; (4) Holland's positive childhood activities and loving relationships prior to drug addiction; and (5) Holland's possible suffering from a mental or emotion disturbance less than "extreme." In Lucas v. State, 568 So.2d 18, 24 (Fla. 1990), this Court stated that "the defense must share the burden and identify for the court the specific nonstatutory mitigating circumstances it is attempting to establish." *1077 Because Holland failed to identify the mitigators in question, the trial court did not err in failing to specifically address them. Further, a review of the sentencing order reveals that most, if not all, of these proposed mitigators were considered by the trial court. For example, the trial court found Holland's history of drug abuse as a nonstatutory mitigator and discussed Holland's cocaine use on the day of the murder.
In issue fifteen, Holland asserts the trial court abused its discretion in admitting Roger Durban's testimony that related to one of Holland's prior robbery charges for which he was found not guilty by reason of insanity. Durban was the attorney who represented Holland in defending these prior charges in Washington, D.C. During the penalty phase of the present case, the defense called Durban as a witness and asked questions about the prior charges. On cross-examination, the State asked Durban the following question: "You remember ... [Holland] saying to [the victim] that he's from St. Elizabeth's and made threats." Holland argues this question was improper because it allowed the State to bring out facts about a previous charge for which Holland was acquitted. We disagree. By asking Durban about the previous charge, the defense opened the door for this question. The question was relevant to establish Holland's tendency to malinger, because although Holland told the victim in that case that he was from St. Elizabeth's, in reality, he had not been admitted to St. Elizabeth's at the time of the alleged robbery. Further, there are no other references in the record to the alleged threats that were made by Holland to the victim in Washington, D.C. For all of these reasons, we find no merit to this argument.
In issue sixteen, Holland argues the trial court improperly doubled the "murder in the course of a felony" and "prior violent felony" aggravators. In Henyard v. State, 689 So.2d 239, 252 n. 15 (Fla.1996), this Court stated:
[T]he trial court considered different aspects of Henyard's crime in finding these two aggravators for each murder. Thus, the presence of these aggravators does not constitute improper doubling and Henyard's claim is without merit.
In the present case, the trial court based the "prior violent felony" aggravator not only on the attempted sexual battery, but also on the attempted murder and a previous conviction in Washington, D.C., for assault with intent to commit robbery. The trial court based the "murder in the course of a felony" aggravator not only on the attempted sexual battery, but also on the robbery of Officer Winters' gun. Thus, there was no doubling in this case.
In issue seventeen, Holland claims that the trial court improperly instructed the jury on the aggravating circumstance that the murder was committed during the commission of a felony. In support of this argument, Holland relies on this Court's opinion in Jones v. State, 580 So.2d 143 (Fla.1991). In Jones, this Court stated that this aggravator was not established because "[t]aking the officer's service weapon, technically an armed robbery, was only incidental to the killing, not the reason for it." Id. at 146. However, the facts of Jones are distinguishable from the present case. In Jones, the defendant and other occupants of a car fired shots at officers while the officers were running a computer check on the car's license tag. A gun battle ensued, and Jones picked up a fallen officer's gun as he was attempting to escape the scene.
The facts of the present case are analogous to the facts of Kearse v. State, 662 So.2d 677 (Fla.1995). In Kearse, the defendant struggled with the officer, stole his gun, and then shot him. This Court found that the aggravator of commission during the course of a robbery was established:
This was not a situation where the taking of the officer's weapon was only incidental to the killing. Kearse forcibly took Officer Parrish's service pistol, then *1078 turned that weapon on the officer and killed him. Even though Kearse may have been motivated by his desire to avoid arrest when he took the gun, the incident still constituted a robbery because it involved "the taking of ... property which may be the subject of larceny from the person or custody of another when in the course of the taking there is the use of force, violence, assault, or putting in fear." § 812.13(1), Fla. Stat. (1991). Under section 812.13, the force, violence, or intimidation may occur prior to, contemporaneous with, or subsequent to the taking of the property so long as both the act of force, violence, or intimidation and the taking constitute a continuous series of acts or events.
Id. at 685 (citations omitted). Based on our reasoning in Kearse, we find no merit to Holland's claim of error on this issue. Further, in addition to relying on the robbery to support this aggravator, the trial court considered the attempted sexual battery. In fact, the trial court specifically stated in its sentencing order that "[e]ach offense, to wit: Robbery and Attempted Sexual Battery alone, without consideration of the other offense for which the defendant Albert Holland, Jr., was convicted, is sufficient to support beyond a reasonable doubt the applicability of this aggravating circumstance."
In issue eighteen, Holland alleges that the trial court abused its discretion in admitting victim-impact evidence during the penalty phase. This issue was rejected by this Court in Windom v. State, 656 So.2d 432, 438-39 (Fla.1995).
In issue nineteen, Holland asserts that the trial court applied a presumption that death was the appropriate penalty when it found the existence of one aggravator. In Elledge v. State, 706 So.2d 1340, 1346 (Fla.1997), this Court rejected this argument, stating:
Elledge next argues that the trial judge erroneously applied a presumption of death because, citing to White v. State, 403 So.2d 331 (Fla.1981), he stated "death is presumed to be the proper penalty when one or more aggravating circumstances are found unless they are outweighed by one or more mitigating circumstances." Although the language from White has been superseded in our recent cases, we find that the trial court properly weighed the aggravating and mitigating circumstances.
(Footnotes omitted.) As in Elledge, the trial court's sentencing order in the present case contains a thorough evaluation of the aggravators and mitigators. Therefore, there is no merit to this issue.
In issue twenty, Holland argues that the "murder in the course of a felony" aggravator is unconstitutional. This Court has rejected this argument on numerous occasions. See, e.g., Blanco v. State, 706 So.2d 7, 11 (Fla.1997).
In issue twenty-one, Holland claims that the sentence of death is disproportionate in this case. Proportionality review is not simply a comparison between the number of aggravating and mitigating circumstances. See Terry v. State, 668 So.2d 954, 965 (Fla.1996). This Court's function in a proportionality review is not to reweigh the mitigating factors against the aggravating factors; that is the function of the trial judge. See Bates v. State, 750 So.2d 6 (Fla.1999). This Court's proportionality review requires it to "consider the totality of circumstances in a case, and to compare it with other capital cases." Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990). The death penalty is reserved only for those cases where the most aggravating and least mitigating circumstances exist. See Kramer v. State, 619 So.2d 274, 278 (Fla.1993).
In the present case, the trial court found three aggravators: (1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; (2) the capital felony was committed while the defendant was engaged in the commission of or in an attempt to commit, or flight after committing or attempting *1079 to commit, the crime of robbery or the attempt to commit the crime of sexual battery or both; and (3)(a) the crime was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, merged with (3)(b) the victim of the capital felony was a law enforcement officer engaged in the performance of his legal duties. The court did not find that any statutory mitigating circumstances were established, but did find the existence of two nonstatutory mitigating circumstances: (1) history of drug and alcohol abuse (little weight) and (2) history of mental illness (little weight). The circumstances of this case are similar to other cases where the death penalty has been imposed. For instance, in Armstrong v. State, 642 So.2d 730 (Fla.1994), the defendant shot a police officer after the officer responded to a robbery in progress at a restaurant. The trial court found four aggravators: (1) prior conviction of a violent felony; (2) commission while engaged in committing a robbery or flight therefrom; (3) commission for the purpose of avoiding arrest or effecting an escape from custody; and (4) murder of a law enforcement officer engaged in the performance of official duties. The trial court did not find any statutory mitigators, but several nonstatutory mitigators were presented. On appeal, this Court affirmed the death sentence. See also Reaves v. State, 639 So.2d 1 (Fla.1994) (holding that death penalty was proportionate for the murder of a deputy sheriff, where the record supported the existence of two aggravators (prior violent felony and avoid arrest), no statutory mitigators, and three nonstatutory mitigators). Based on these cases, we find that the death penalty is proportionate in this case.
Finally, in issue twenty-two, Holland asserts that electrocution constitutes cruel and unusual punishment. We recently rejected this argument in Provenzano v. Moore, 744 So.2d 413 (Fla.1999). Further, the Legislature has amended sections 922.10 and 922.105, Florida Statutes, which now give capital inmates the choice of lethal injection or electrocution. Hence, there is no merit to this claim.
Accordingly, for the reasons expressed in this opinion, we affirm the convictions and sentences, including the sentence of death.
It is so ordered.
WELLS, C.J., and SHAW, HARDING and QUINCE, JJ., concur.
ANSTEAD and PARIENTE, JJ., concur in result only.
LEWIS, J., concurs in result only as to conviction and concurs as to sentence.
NOTES
[1] Holland raises the following issues: (1) the trial court erred in denying Holland the opportunity to represent himself; (2) the trial court improperly instructed the jury on the intent element of felony murder and attempted sexual battery; (3) the trial court abused its discretion in denying Holland's motion to exclude the testimony of the State's mental health experts; (4) the trial court erred in failing to disqualify state attorney Michael Satz and the state attorney's office; (5) the trial court abused its discretion in denying Holland's motion to re-depose certain witnesses; (6) the trial court abused its discretion in overruling Holland's objections to the admissibility of a videotape; (7) the trial court abused its discretion in denying Holland's motion to suppress his statements to the police; (8) the trial court abused its discretion in allowing the admission of Dr. Tate's prior testimony; (9) the trial court abused its discretion in denying Holland's motion for judgment of acquittal; (10) the trial court abused its discretion in denying Holland's objections to Dr. Martell's testimony; (11) the trial court erred in rejecting as nonstatutory mitigation that Holland had two prior adjudications of insanity in Washington, D.C.; (12) the record does not support the trial court's findings regarding Dr. Polley and Dr. Patterson's testimony and the mental mitigators; (13) the trial court erred in rejecting the "extreme mental or emotional disturbance" mitigator; (14) the trial court failed to consider certain nonstatutory mitigators; (15) the trial court abused its discretion in admitting Roger Durban's testimony that related to one of Holland's prior offenses for which he was found not guilty by reason of insanity; (16) the trial court improperly doubled the "felony murder" and "prior violent felony" aggravators; (17) the trial court improperly instructed the jury on the "felony murder" aggravator and the record does not support this aggravator; (18) the trial court abused its discretion in admitting victim-impact evidence; (19) the trial court applied a presumption that death was the appropriate penalty when it found the existence of one aggravator; (20) the "felony murder" aggravator is unconstitutional; (21) the sentence of death is disproportionate; and (22) electrocution constitutes cruel and unusual punishment.
[2] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).