899 So.2d 412 (2005)
Albert GUILDER, Appellant,
v.
STATE of Florida, Appellee.
No. 4D01-3035.
District Court of Appeal of Florida, Fourth District.
March 30, 2005.
Rehearing Denied April 29, 2005.
*414 Carey Haughwout, Public Defender, and David John McPherrin, Assistant Public Defender, West Palm Beach, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and August A. Bonavita, Assistant Attorney General, West Palm Beach, for appellee.
POLEN, J.
This appeal arises from a rather bizarre set of circumstances resulting in the Appellant, Albert Guilder, being charged with unlawfully intercepting and/or endeavoring to intercept an oral communication in violation of section 934.03, Florida Statutes (1999). Contrary to Guilder's position, we find that recording a face-to-face conversation in which the defendant is a participant, without prior consent of the other person, does constitute an interception of an oral communication. We are also unpersuaded by Guilder's argument that the trial court failed to conduct a proper Faretta[1] hearing. Accordingly, we affirm for the reasons that follow.
Guilder had a son who was charged with burglary. After his son was convicted, Guilder uncovered juror misconduct warranting a new trial for his son. At the son's second trial he was again convicted of burglary. Guilder again set out to obtain a new trial for his son by uncovering juror misconduct. Guilder contacted Thomas Carney, a retired FBI agent now working as a private investigator, who had earlier helped his son's attorney in the burglary cases. Guilder sought help in taking and recording formal statements. Carney instructed Guilder that he should not record any interviews surreptitiously.
On November 4, 1999, Guilder proceeded to interview former juror Rose Connelly. Guilder, who was wearing a press badge[2] and carrying a clipboard, approached Connelly's house where he found Connelly and her sister sitting on the porch. Connelly's sister left the porch to give Connelly and Guilder privacy, but testified that she never saw a tape recorder. Likewise, Connelly never saw a tape recorder nor was she even aware that her conversation was being recorded. On November 7, 1999, Guilder went to the home of Debra Ventura, another juror who served on Guilder's son's case. Guilder again wore a press pass and initially failed to display a tape recorder or seek permission to record the conversation. It was not until the middle of the conversation that Guilder revealed that he had a tape recorder. Ventura noticed Guilder remove the tape recorder from his pocket and fidget with it back and forth. Ventura assumed he was going to start recording at that point but Guilder never sought permission and the issue was not discussed until later. Toward the end of the conversation, Guilder finally sought permission to record the conversation, at which point Ventura chose not to object believing any objection would be futile. At some point in this conversation Guilder acknowledged recording his earlier conversation with *415 Connelly and that his son's attorney informed him that he should not have done so. Both Connelly and Ventura later made contact with the State Attorney's Office.
After Guilder's encounters with the former jurors, Guilder went to his son's attorney's office. After only casually listening to the tape, the attorney filed a motion for new trial, which was later withdrawn after careful consideration for a lack of merit. On November 12, 1999, Assistant State Attorney Jason Grosz went to the attorney's office with a subpoena to obtain the tape recording. While Grosz was at the attorney's office, Guilder showed up and remarked "it may have been illegal ... to do so but at least [I] had all of the jurors documented." Likewise, when Guilder was subsequently arrested, he stated "can you believe all this just because I recorded somebody." At no point prior to any of these incidents had Guilder informed anyone, nor did anyone observe or even suspect, that Guilder had a disability,[3] which under the ADA would allow him to record conversations.
Guilder first appeared for arraignment before a judge on January 13, 2000. At this point, Guilder started providing substantial resistance to the legal process.[4] Although Guilder did not have an attorney, he did want representation. Before the issue of representation could be discussed, Guilder requested a copy of the charging document and interrupted the trial court as it was trying to read the charges against him. The trial court lost its patience with Guilder and decided to enter a not guilty plea over Guilder's objection.
Guilder next appeared in court on March 29, 2000, this time before Judge Tobin.[5] Judge Tobin readdressed the issue of Guilder's representation. Guilder sought representation, yet refused to have a member of the bar represent him. Rather, Guilder apparently wished to have an unlicensed attorney represent him, as he distrusted all bar members. The trial court refused to allow lay or unlicensed representation, but offered (1) self-representation, (2) representation by a member of The Florida Bar, or (3) representation by a member of the Bar of any other state. Guilder refused to chose from those options. When the trial court attempted to swear in Guilder to determine indigence and/or conduct a Faretta hearing, Guilder refused to be sworn or to answer the trial court's question regarding his indigence, responding:
I'm not represented by counsel, Your Honor. Therefore, in an abundance of caution, my life and my liberty is at stake here, and I'm not going to be answering any questions from the bench because I don't know if you are trying to trick me into giving you jurisdiction or what's going on.
The trial court gave up and appointed a public defender.
At a later hearing again in front of Judge Tobin, the public defender's office informed the trial court that it had no correspondence with Guilder with the exception of a letter from Guilder which stated that he does not seek representation from that office. After another frustrating dialog in which Guilder again refused to *416 answer questions on his indigence, the trial court relieved the public defender's office. On May 4, 2000, a hearing was held on Guilder's motion to set aside his arraignment and entry of a plea. After yet another frustrating dialog on the issue of representation, the trial court found Guilder competent to represent himself based on his in-court appearances and a review of his pleadings filed with the court. Later, Judge Tobin conducted an evidentiary hearing, based on Guilder's motion to suppress, in which the court found that no attorney-client privilege existed between Guilder and his son's attorney and that the tape was not work-product.
The case was again transferred, this time coming before Judge Lebow. Judge Lebow found Guilder's pleadings legally senseless and again attempted to conduct a Faretta hearing. Guilder stated:
Well, your Honor, I've never represented myself. I do not represent myself and I will not represent myself. I don't have the ability to represent myself. I am here defending my life and my liberty and I am granted assistance of counsel of my choice that will not be a member of the bar association. I must continue on defending my life and my liberty.
Judge Lebow inquired as to whether Guilder suffers any mental or emotional problems as a result of his alleged illness and Guilder responded: "under the American Disability Act the court does not have the right to inquire ... in anyway, shape or form." Judge Lebow ultimately found that Guilder was not competent to represent himself and appointed a special public defender. Guilder's new counsel moved to supplement Guilder's earlier motion to suppress again arguing that Guilder was working on his son's behalf and therefore the tape is work-product or, alternatively, that the son's attorney violated his ethical duty of keeping his client's confidences. Judge Lebow, after hearing counsel's full argument, denied the renewed motion to suppress. The case finally went to trial and the jury eventually found Guilder guilty. The trial court withheld adjudication and placed Guilder on probation for 2 1/2 years.
On appeal, Guilder argues that tape recording a face-to-face conversation in which one is participating, without prior consent from all participants, does not constitute an interception of an oral communication prohibited by section 934.03(1)(a), Florida Statutes (1999). Guilder recognizes that the Florida Supreme Court has already addressed this issue directly, and in favor of the State here, but argues that the supreme court misapplied prior precedent and misinterpreted legislative intent.
Section 934.03 provides, in relevant part, that "any person who ... intentionally intercepts, [or] endeavors to intercept, . . . any ... oral ... communication ... is guilty of a felony of the third degree." The legislature defines intercept as "the aural or other acquisition of the contents of any ... oral communication through the use of any electronic, mechanical, or other device." § 934.02(3), Fla. Stat.
In Shevin v. Sunbeam Television Corp., 351 So.2d 723, 725 (Fla.1977), two media entities claimed that secret recordings during investigative reporting activities were necessary to insure the accuracy of the information gathered and to preserve the conversation. Accordingly, the entities argued that the then recent amendment to section 934.03(2)(d)[6] impaired its news *417 gathering dissemination activities and constituted a prior restraint in violation of the First Amendment. Id. The supreme court, apparently under the belief that recording a conversation in which one is a participant constituted intercepting a conversation, held the amendment constitutional finding that "[t]his was a policy decision by the Florida legislature to allow each party to a conversation to have an expectation of privacy from interception by another party to the conversation." Id. at 726-27. The supreme court again addressed this issue in State v. Walls, 356 So.2d 294, 296 (Fla.1978), when it held that "an extortionary threat delivered personally to the victim in the victim's home is an `oral communication' ... [and] pursuant to Section 934.03, the electronic recording of such `oral communication' without the consent of all parties to the communication was prohibited."
Although the issue at bar had been touched upon, it was not until State v. Tsavaris, 394 So.2d 418, 420 (Fla.1981), receded from on other grounds, 478 So.2d 38 (Fla.1985), that the issue was finally discussed with any depth when the second district certified the following question: "Does the recording of a conversation by one of the participants constitute the interception of a wire or oral communication within the meaning of Chapter 934, Florida Statutes (1979)?" In Tsavaris, a medical examiner tape recorded a telephone conversation with a murder suspect who called him. A majority of the court answered affirmatively finding:
Intercept is defined by section 934.02(3) to mean the "aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." "Aural acquisition" means to gain control or possession of a thing through the sense of hearing. Thus pursuant to section 934.02(3), "to intercept" means to gain control or possession of a communication through the sense of hearing and through the use of an electronic or mechanical device. We think it is clear that [the medical examiner's] recording of his telephone conversation with [the murder suspect] fits the explicit terms of the statutory definition.
* * *
The history and recent amendments to chapter 934 demonstrate that the act was intended to afford broad protection to private communications. Chapter 934, the Florida Security of Communications Act, was patterned after Title III of the Omnibus Crime Control Act of 1968, 18 U.S.C. s. 2510, et seq. Prior to 1974 the Florida act, like its federal counterpart, permitted the interception of defined wire or oral communications when one party to the communication gave consent.... Effective October 1, 1974, however, chapter 74-249, Laws of Florida, amended the act to require all parties to a defined wire or oral communication to give prior consent .... This amendment "was a policy decision by the Florida legislature to allow each party to a conversation to have an expectation of privacy from interception by another party to the conversation." Shevin v. Sunbeam Television Corp., 351 So.2d at 726-27. Accord, State v. News-Press Publishing Co., 338 So.2d 1313, 1316 (Fla. 2d DCA 1976) .... "(t)he (Florida) Legislature has determined as a matter of state public policy *418 that the right of any caller to the privacy of his conversation is of greater societal value than the interest served by permitting eavesdropping or wiretapping." State v. Walls, 356 So.2d at 296 (quoting from Markham v. Markham, 265 So.2d 59 (Fla. 1st DCA 1972), affirmed, 272 So.2d 813 (1973)). Hence, the Florida act evinces a greater concern for the protection of one's privacy interests in a conversation than does the federal act. Equally certain is the fact that the 1974 amendment to chapter 934 was designed to proscribe the method of interception used in this case. On the floor of the Florida House of Representatives, the only recorded debate on the two-party consent requirement of section 934.03(2)(d) was this comment by Representative Shreve:

(What this bill does) is to prevent, make it illegal, for a person to record a conversation, even though he's a party to it, without the other person's consent.[7]
With no further debate, the bill passed the House 109-1. We regard this lone and uncontested comment as telling evidence of the unlawful nature of [the medical examiner's] recording. The district court decision in Tsavaris goes to great lengths to convince this Court that State v. Walls was incorrectly decided and should be overruled. We remain wholly unpersuaded.
Tsavaris, 394 So.2d at 421-22 (footnotes omitted) (emphasis added).
However, Guilder relies heavily on Justice Alderman's dissenting opinion in Tsavaris.
One does not intercept a conversation made directly to himself. Tsavaris's communication was lawfully received over the telephone receiver; therefore, the recording of it by [the medical examiner] was not an interception.... no interception took place when [the medical examiner's] heard Tsavaris's voice over his telephone receiver. This clearly was a legal reception of a wire communication, and it therefore cannot be said that [the medical examiner's] recording of this communication after it had arrived at its destined place was the recording of an initial illegal interception.... There is no provision in chapter 934 that makes the recording of a communication by itself illegal.... I cannot believe that the legislature intended to brand as a third-degree felon the victim of extortionary threats, who, while in his home, electronically records the threats made against him.... If the legislature had intended to make it unlawful for any person to record an oral or wire communication, it could easily have done so in plain and simple language. It did not. Instead, it criminalized only the willful interception of wire or oral communication. § 934.03(1)(a). When section 934.02(2)(d) was amended to provide that it was lawful to intercept a wire or oral communication when all of the parties to the communication have given prior consent to such interception, the legislature still referred only to interceptions, not recordings. While it is true that it is illegal to record an illegal interception, the recording of an otherwise lawfully received oral or wire communication is not an unlawful interception.... The majority says that the legislature intended that for this public-spirited action *419 [the medical examiner] is guilty of a third-degree felony. Surely, the legislature did not intend such an absurd result. I hope that the legislature will correct what I perceive to be the majority's judicial distortion of chapter 934.

Id. at 431 (dissent)(emphasis added).
While Justice Alderman's dissent makes a practical argument, this court is bound to follow the majority opinion in Tsavaris. This court has already unsuccessfully advocated change in Inciarrano v. State, 447 So.2d 386, 391 (Fla. 4th DCA 1984), when it concedingly certified the same question presented in Tsavaris and the supreme court chose to decide that case on a narrower ground and not to address the certified question or Tsavaris, presumably under the belief that Tsavaris is still sound. Likewise, Justice Alderman's invitation to the legislature to correct what he believed to be the majority's "distortion" or misconception went unanswered. "It is a firmly established rule that `Courts must apply a statute as they find it, leaving to the legislature the correction of assorted inconsistencies and inequalities in its operation.'" State v. Aiuppa, 298 So.2d 391, 404 (Fla.1974) (citing McClain v. Commissioner of Internal Revenue, 311 U.S. 527, 61 S.Ct. 373, 85 L.Ed. 319 (1940)). As the supreme court has already declined to revisit the issue and the legislature has also failed to take issue with the interpretation given to section 934.03 by the supreme court, we affirm under the precedent of Tsavaris.
As a further note, we cannot help but express our concern that the illegally recorded conversations were of interviews conducted by Guilder, without judicial approval,[8] of jurors who had sat on his son's burglary trial. In this age of high-profile celebrity trials such as those of O.J. Simpson and Michael Jackson, media attention on all participants in such trials, including the jurors, has heightened significantly. Even where judges wisely order that jurors should not be mentioned by name, the media nonetheless focus on the racial, ethnic, and gender make-up of such juries, as well as whatever background information on the jurors they might obtain. Needless to say, prospective jurors who might otherwise seek to avoid this responsibility of citizenship now have but one more reason to feel jury duty should be avoided at all costs. If the recording of conversations with would-be batterers and murderers is prohibited, surely the recordings Guilder obtained in this case under the false pretenses of wearing a press badge should be dealt with every bit as severely.
Guilder's next argument on appeal is that the trial court erred by failing to conduct a proper Faretta inquiry before ruling that he was competent to waive his right to assistance of counsel and represent himself.
The Sixth Amendment of the U.S. Constitution guarantees the right of self-representation.. . . "[A] criminal defendant who is competent to choose self-representation may not be denied that choice, even though the decision for self-representation will most certainly result in incompetent trial counsel." There are no "magic words" in a Faretta inquiry. Rather, we look to the defendant's general understanding of h[is] rights as codified in rule 3.111(d), Florida Rules of Criminal Procedure.
Wheeler v. State, 839 So.2d 770, 772 (Fla. 4th DCA 2003). "A trial court's decision as to self-representation is reviewable for *420 abuse of discretion." Holland v. State, 773 So.2d 1065, 1069 (Fla.2000).
Upon viewing all of the proceedings amongst the various trial judges in this case, we find that there was no error. First, we note that the first trial court's conduct most likely constituted a sufficient Faretta inquiry. Again, "[t]here are no `magic words' in a Faretta inquiry. Rather, we look to the defendant's general understanding of h[is] rights." Wheeler, 839 So.2d at 772. While the trial court may not have thoroughly instructed Guilder of his rights, such instruction was in all likelihood unnecessary. Guilder, during the attempted Faretta inquiry, informed the trial court of his right to counsel under the 6th and 14th Amendments to the Constitution, and even cited Faretta in referring to various supreme court decisions upholding that right. Additionally, "Faretta requires that a defendant be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and that his choice is made with eyes open." Morris v. State, 667 So.2d 982, 986 (Fla. 4th DCA 1996) (citation omitted). Again, while the trial court may not have thoroughly instructed Guilder on the disadvantages of a pro se defense, "the Florida Supreme Court held that while a waiver hearing expressly addressing the disadvantages of a pro se defense is much to be preferred, it is not absolutely necessary. The ultimate test is not the trial court's express advice, but rather the defendant's understanding." Butler v. State, 767 So.2d 534, 539 (Fla. 4th DCA 2000) (citation omitted). Therefore, this prong of Faretta was satisfied when Guilder acknowledged to the trial court on two separate occasions that he who represents himself, has a fool for a client. Guilder's choice not to have representation by a member of the bar was done with full understanding of the advantages and disadvantages of such. As such, the earlier trial court did not abuse its discretion by failing to conduct a proper Faretta inquiry.
Notwithstanding, the last trial court cured any possible error committed by the earlier trial court. Although Guilder submitted numerous pro se pre-trial motions, the only motion that had any impact on the trial, and for that reason the only ruling that Guilder addresses on appeal was Guilder's motion to suppress the tape recording of the conversation between Guilder and Connelly. However, the proceedings before the last trial court, in which Guilder was represented by counsel at all meaningful stages including the trial itself, started with a nearly clean slate. Although the earlier trial court denied the pro se motion to suppress, the third and last trial court allowed Guilder's new counsel to supplement and essentially reargue the prior motion in full. The fact that this motion was again denied is not dispositive. Likewise, Guilder does not challenge the merits of this ruling. Therefore, we find that any error was subsequently cured.
Finally, as a practical matter, we wish to highlight Guilder's totally untenable position of demanding counsel but refusing representation by a member of the bar of any state. The trial court handled itself appropriately in light of Guilder's unreasonable demand and the commensurate strain on judicial resources. As we are unpersuaded by Guilder's remaining issues on appeal, we affirm the trial court's judgment of guilt.
AFFIRMED.
STEVENSON and GROSS, JJ., concur.
NOTES
[1] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[2] Needless to say, Guilder was not representing any media at the time.
[3] Guilder claims he suffers from narcolepsy, and that neither he nor others know when he is sleeping.
[4] The first words Guilder spoke at the arraignment were: "Can I tape this for my own record?"
[5] Judge Tobin refused to allow Guilder to record the proceeding, which he proceeded to do without permission.
[6] "Section 934.03(2)(d), Florida Statutes, was amended in 1974, by Chapter 74-249 (S.459), Laws of Florida, to require all parties to the defined wire or oral communication to give prior consent to a defined interception: `It is lawful under this chapter for a person to intercept a wire or oral communication when all of the parties to the communication have given prior consent to such interception.'" Shevin, 351 So.2d at 724. Prior to this amendment, it was legal for a person to intercept an oral communication without prior consent if he was a party to that conversation. Id.
[7] According to Tsavaris this excerpt was "[t]aken from the tape of the afternoon session, Florida House of Representatives' debate of SB 459, on May 30, 1974." 394 So.2d at 422, n. 5.
[8] See, e.g., Fla. R. Civ. P. 1.431(h).