[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12404

_____

D.C. Docket No. 1:06-cv-20182-PAS

ALBERT HOLLAND, JR.,

Petitioner - Appellant
Cross Appellee,

versus

STATE OF FLORIDA,

Respondent - Appellee
Cross Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 29, 2014)

Before ED CARNES, Chief Judge, and MARCUS and WILLIAM PRYOR,
Circuit Judges.

MARCUS, Circuit Judge:

A Florida court convicted Albert Holland of murder and sentenced him to

death for the fatal shooting of police officer Scott Winters.  The district court

issued a writ of habeas corpus on the ground that Holland's right to represent

himself was violated.  To obtain a writ under 28 U.S.C. § 2254(d)(1) (2012),

Holland must show that the Florida Supreme Court's denial of his claim was

contrary to or an unreasonable application of clearly established Supreme Court

law.  He does not.  Consistent with Faretta v. California, 422 U.S. 806 (1975), the

Florida Supreme Court reasonably determined that, because of his serious mental

disabilities, Holland did not knowingly and voluntarily waive his right to counsel.

Accordingly, we reverse the district court's grant of habeas relief.

Holland appeals three other claims the district court rejected.  We too find

they lack merit.  Holland argues that the Florida Supreme Court unreasonably

applied harmless error analysis to the admission of both an inaudible videotape and

a mental health expert's opinion about whether a firearm had been hidden.   We

conclude that both errors were harmless because they did not have a "substantial

and injurious effect or influence" on the jury's verdict.  Brecht v. Abrahamson, 507

U.S. 619, 637 (1993) (quotation omitted).  As the record amply reveals, the

interrogating officer testified to the contents of the videotape and an investigating

officer made similar comments about the gun's location.  Holland also claims that

he received ineffective assistance because his trial counsel failed to object to a

number of improper statements made by the prosecution during closing arguments.

2

The district court found federal relief was procedurally barred because Holland did not exhaust this claim in state court. While we conclude that exhaustion does not bar Holland's claim, we affirm because the Florida Supreme Court's determinations that counsel performed adequately and that Holland suffered no prejudice were reasonable. See Strickland v. Washington, 466 U.S. 668 (1984). Finally, Holland says that his custodial confession should have been suppressed because he talked to police after he asked for a lawyer. In denying relief because Holland initiated the conversation with the detective, the Florida Supreme Court did not unreasonably apply Edwards v. Arizona, 451 U.S. 477 (1981).

Accordingly, we remand to the district court with instructions to reinstate Holland's conviction and sentence.

## I.

### A.

The facts relevant for this appeal begin with the observation that Holland suffered a serious brain injury in October 1979, when another inmate in a federal prison knocked him unconscious. The beating left Holland with a slowly resolving concussion, facial fractures, and three weeks of post-traumatic amnesia. In the early 1980s, Holland was arrested and charged with robbery in Washington, D.C. Holland's attorney described him as "clearly a homeless individual, and disheveled, and incoherent, and not able to interact with me in any way, shape, or

meaningful form, at all." "In the early meetings, . . . he would have nothing to say, but would rock in a chair with his hands folded. I remember, distinctly, that he would drool." The United States prosecutor agreed with defense counsel that Holland was not legally culpable because he had been insane. The court found Holland was not guilty of the robbery by reason of insanity, based on testimony from a doctor that Holland suffered from a mental defect or disease that interfered totally with his ability to appreciate the wrongfulness of his conduct or conform his behavior to the requirements of law. He was placed in Saint Elizabeth's Hospital, and he saw at least six doctors during his time there. At Saint Elizabeth's, doctors first diagnosed him with "schizophrenia, undifferentiated type, and Organic Amnestic Syndrome," which indicates a significant memory impairment. A second evaluation discontinued the Organic Amnestic Syndrome diagnosis but did not alter the schizophrenia diagnosis. Still, some of Holland's doctors suggested that he suffered less from schizophrenia and more from "organic psychosis" tied to his brain injury. At Saint Elizabeth's, Holland was treated with Thorazine, an antipsychotic, and Cogentin to deal with side effects. Holland escaped from Saint Elizabeth's, and thereafter was charged with a new robbery. With the agreement of an attorney for the United States, a different judge found Holland not guilty by reason of insanity a second time and again sent him to Saint Elizabeth's. He absconded from the hospital yet again in May 1986.

4

Four years later, after smoking a rock of crack cocaine, Holland attacked and brutally beat Thelma Johnson in Pompano Beach, Florida, on July 29, 1990. Holland ran off when a witness intervened, leaving the victim semi-conscious and with severe head injuries. Police searched for the assailant and K-9 patrol officer Scott Winters of the Pompano Beach Police Department found Holland. Witnesses saw the two struggling. Holland grabbed Winters's gun and fatally shot him in the groin and lower stomach. See Holland v. State (Holland II), 773 So. 2d 1065, 1068 (Fla. 2000) (per curiam).

Holland was first tried, convicted, and sentenced to death in 1991. During that trial, Holland's disruptive behavior led to his removal from the courtroom. On direct appeal, the Florida Supreme Court reversed his conviction because admission of testimony about a psychiatric examination of Holland violated his right to counsel and his right against self-incrimination. See Holland v. State (Holland I), 636 So. 2d 1289 (1994) (per curiam).

On remand, the trial court appointed Kenneth Delegal to represent Holland in the second trial. After about a year, this representation terminated when Delegal was confined to a mental health facility. Delegal eventually was arrested on drug and domestic violence charges and died of a drug overdose during Holland's retrial. The trial court then appointed James Lewis, who shared office space with Delegal, to assume representation of Holland because Lewis had some familiarity

with the case.  Evan Baron, appointed alongside Delegal to serve as penalty phase counsel, continued to represent Holland as well.

Before the second trial began, at a September 15, 1995, hearing, Lewis told the court Holland had refused to see or speak to him.  Holland expressed severe suspicion of Lewis, his lawyer: "it's like he's sneaking around like a little mouse."  Holland in turn informed the court that he believed Lewis and jail authorities had taped a visit between Holland and his father through a sprinkler head.  Indeed, Holland thought Lewis was using his father to convince him to keep Lewis as his attorney.  Holland did not believe that his father's trip was cut short by an approaching hurricane, and "if [Lewis] will lie about something, little petty like that, he's going to do some other things on the bigger issue."  Holland told the court that, when he tried to call his father, "the lady wouldn't let me call . . . because everybody works together."

Holland's paranoid suspicions went deeper.  Holland also told the trial court, "They're trying to get something on me. . . . Seems like I'm always being taped."  "I got microphones in my cell, too.  But if I'm going to try to find them, I got to tear the light off the wall."  Holland worried about surveillance because "I talk to invisible people . . . [b]ut it may be dealing with my case."  When assured by the court that he was not being taped in his cell or during visits with his father or attorney, Holland responded, "betrayal will lurk."  He continued, "everybody at the

6

bar where all the lawyers drink at know about my case. Everybody knows everything. My strategy, anything that's going to be going on."

Also before the second trial began, Holland's counsel, Lewis, filed a motion alleging Holland was incompetent to stand trial. At a hearing conducted on October 9, 1995, Lewis explained that Holland had indicated he was having suicidal tendencies and had asked to see a psychiatrist or "possibly be prescribed some type of psychotropic medication." The trial court authorized three mental health experts to examine Holland for competence to stand trial and directed that a psychiatrist evaluate Holland to determine whether he needed psychotropic medication.

On December 14, 1995, the trial court followed up with a hearing to determine Holland's competency to stand trial. Two mental health experts who interviewed Holland testified that he was competent, while a third said he met the criteria for competency but believed the ultimate conclusion was for the finder of fact. One psychologist specializing in clinical neuropsychology, Dr. Lee Bukstel, told the trial court about Holland's treatment for schizophrenia at Saint Elizabeth's Hospital. Bukstel also said that a jail psychiatrist had recently diagnosed Holland with an unspecified psychotic disorder and anti-social personality disorder. That psychiatrist prescribed Haldol, an anti-psychotic, though Bukstel said Holland had refused to take it. Another mental health expert testified at the competency hearing

7

that Haldol calms patients with emotional problems, but that people often act out when they stop taking medication. According to Bukstel, Holland appeared psychologically stable, though he noted that Holland's statements to the court about secret tape-recording showed unrealistic suspicions and paranoia. Bukstel explained that Holland complained of "pain and tension" in his head and "burning in [his] mind." Holland reported depression, anxiety, nervousness, crying, agitation, decreased initiative, social avoidance of people, and increased dependency on others, as well as difficulties with concentration, decisionmaking, and memory. Bukstel concluded that Holland's symptoms were consistent with one or more mental disorders. Still, Bukstel joined the other mental health experts in opining that Holland's mental problems did not prevent him from meeting Florida's statutory criteria for competence to stand trial: Holland's psychological disorders did not keep him from understanding the legal proceedings and possible penalties, from communicating with his attorney, from testifying relevantly, or from manifesting appropriate courtroom behavior.

After hearing testimony from the mental health experts, the trial court found Holland competent to stand trial based on the statutory standards. Still, the trial court noted that it had "heard Mr. Holland raise some concerns that gave the Court some question as to his mental status." The court also observed that Holland's behavior during his first trial led to his removal, though Holland had not acted out

8

so far during retrial proceedings.

At another pretrial hearing (on March 22, 1996) Holland again complained at length about his attorneys and asked to "go through this procedure of self-representation." The trial court said it would conduct a <u>Faretta</u> inquiry, whereupon it asked Holland about his educational experience -- "a GED" -- and his legal training. Holland replied, "Well, from what I've seen in the evidence, Ray Charles could come in here and represent himself and Stevie Wonder, so I don't need too much legal training to do all that." The trial court questioned Holland about his ability to select a jury, make legal objections, and examine witnesses. Holland exhibited little familiarity with the process and said he had no training. Holland offered that he wouldn't violate any rules but admitted he did not know the rules he could violate. At this point, the trial court stopped the inquiry and ruled that "Holland does not have any specific legal training, is not familiar with the rules of evidence, nor trial procedures, is not familiar with how a trial is conducted, even though he's sat through them in the past." In a written order, the court denied the defendant's motion to represent himself, finding that Holland was incapable of doing so.

At still another pretrial hearing (conducted on August 2, 1996) on a defense motion to authorize an MRI of Holland to scan for brain damage, Holland again asked the trial court either to remove his attorneys or to allow him to represent

9

himself.  The Court conducted still another Faretta inquiry, discussing with Holland his education, training, and knowledge of legal rules and procedures. Holland repeatedly interrupted the trial court as it ruled that Holland was "not able to adequately appropriately represent himself . . . [n]or to comply with the Court's order, nor with applicable rules of evidence, rules of criminal procedure, as well as case law."

On August 26, 1996, Holland's counsel moved to withdraw on the ground that Holland thought he would be better off handling the case on his own.  This time, at considerable length, the trial court explained its past refusal to allow Holland to represent himself.  The court recounted that "Holland has suffered an injury to the head and was hospitalized at Saint Elizabeth's in Washington D.C. while he was incarcerated approximately . . . ten, twelve years ago."  Holland "obtained a GED since he's been incarcerated."  He "obviously sat through his prior first degree murder trial, but that is not exactly correct, because due to Mr. Holland's behavior Mr. Holland was removed from that courtroom and watched that proceeding on closed-circuit television."  Therefore, Holland had "previously demonstrated . . . his inability to follow the Court's orders and decorum required to be in a courtroom."  Holland also failed to demonstrate the legal knowledge and skills required to present his own case.  Finally, Holland's lawyer had filed a notice of intent to rely on the defense of insanity, which "touches upon his mental

10

condition and ability to understand the nature as well as the complexity of this case." With this background, the trial court stated that it would conduct a dual Nelson[1] and Faretta inquiry to determine whether Holland's counsel should be discharged and whether Holland could represent himself.

Reading from notes, Holland began by asking the court "how much time am I going to have, because you always rush me, because I feel you're biased against me and you never give me enough time to talk." Holland said the judge was working in collusion with his attorneys and the prosecution. "[E]verything [that] has been going on with you, Your Honor, and my attorneys shows there is impropriety. There is some monkey business going on here. Underhandedness." "[A]ny reasonable person can tell that I'm not going to get a fair trial. If they knew all of the facts, everything that you're doing. It's all a money thing and all a convicting thing. You made up your mind. You want to be the only judge to send somebody to the electric chair with [the prosecutor]." Holland complained about one of his attorneys, Baron, stating that "[i]t's just a sham because he's supposed to be giving me effective assistance of counsel when he's trying to help the prosecution." He accused his lawyer Lewis of "trying to provoke me, looking real

---

[1] Under Florida law, when a defendant seeks to discharge court-appointed counsel before trial on account of ineffectiveness, "the trial judge should make a sufficient inquiry of the defendant and his appointed counsel to determine whether or not there is reasonable cause to believe that the court appointed counsel is not rendering effective assistance to the defendant." Nelson v. State, 274 So. 2d 256, 258-59 (Fla. Dist. Ct. App. 1973).

11

crazy at me, trying to get me to respond to him." He said that, because of their previous connection to Delegal, he knew Lewis and Baron were smoking crack. "All they did was make a good hustle. . . . They made a little extra in the pocket helping a friend cover up and helping the prosecution at the same time, and everybody is happy." At one point, Holland asked the judge, "Are you listening . . . or are you drinking coffee?" Holland's soliloquy focused almost exclusively on his suspicions about his attorneys and the court, not on a desire to represent himself or an explanation of why he knowingly and voluntarily sought to give up the right to counsel.

Wrapping up, Holland referred to the outline of notes he had read, saying "I used to hide them . . . I know they look at them, shake them. . . . I know they have bugs. . . . I used to carry these to work out, check out, I have all of my papers in my pocket." When asked about his first trial, Holland said that officials had not turned on the monitor to allow him to watch the closed-circuit feed after he was removed from the courtroom -- "[i]t was a bunch of show." The trial court concluded that Lewis and Baron were qualified and able to represent Holland effectively. The court refused to allow Holland to represent himself, citing "his lack of formal legal training, lack of understanding of both the criminal law as well as procedures, his alleged defense or defense actually, of insanity and the complexity of this case," with "approximately 180 witnesses listed." Holland's response: "All of you

12

working together. . . .  Bald-faced liars."

On September 18, 1996, on the eve of retrial, Holland still again complained about his attorneys and sought to represent himself.  The court replied, "these are issues the Court previously addressed, previously ruled on.  There is nothing new." Holland responded that "I wasn't found competent then, I was found competent now, and I'm literate and I'm understanding and I would like to voluntarily do my own defense."  The court responded that it had "found you competent several months ago and entered it's [sic] order. . . . Motion to represent yourself is denied."

Holland asked yet again to represent himself before voir dire of the jury on the first day of retrial.  Again the court refused, referencing its earlier rulings.  Not dissuaded in any way, Holland made the same request on October 1, 1996, during jury selection, with the same results, and again on October 3 and October 8.  The court said, "Mr. Holland, even my patience at some point ends. . . . I'm tired, candidly, Mr. Holland, every time we come in the door, hearing the exact same speech from you.  I've heard it.  It's on the record.  Your motions are denied and that's it."  When the defendant pressed on, the court said, "Mr. Holland, you do not have the first idea, candidly, of how to properly represent yourself and that's it." Holland responded that "I can do better than what they are doing. . . . He who represents themselves has a fool for a client, and I'm that fool.  I want to represent myself."  The court was unmoved: "[t]he stakes are too great for you to represent

13

yourself." Before Holland testified in the guilt phase, the court found that Holland knowingly and voluntarily waived his right against self-incrimination. The court also recognized that he had waived any argument that he could not be found guilty of lesser included offenses.

The jury convicted Holland of first-degree murder, armed robbery, attempted sexual battery, and attempted first-degree murder. Before the penalty phase began, Holland once more asked for his attorneys to be replaced. When this request was denied, Holland refused to speak with counsel or the court, choosing instead to read a book during all court proceedings outside the presence of the jury. Holland did not testify in the penalty phase or at the Spencer hearing.[2]

The jury recommended the death penalty by a vote of eight to four. The trial court found three statutory aggravating circumstances: Holland was previously convicted of a felony involving the use or threat of violence to a person, Fla. Stat. § 921.141(5)(b) (2010); the capital felony was committed while Holland was engaged in the commission of, or in an attempt to commit, or flight after committing or attempting to commit the crime of robbery or an attempt to commit the crime of sexual battery or both, id. § 921.141(5)(d); and the crime was committed for the purpose of avoiding or preventing a lawful arrest or effecting an

---

[2] Under Florida law, a Spencer hearing gives the defendant, his counsel, and the State the opportunity to be heard and to present additional evidence to the sentencing judge after the jury has offered its recommendation. See Spencer v. State, 615 So. 2d 688, 690-91 (Fla. 1993) (per curiam).

14

escape from custody, id. § 921.141(5)(e), which merged with the fact that the victim of the capital felony was a law enforcement officer engaged in the performance of his legal duties, id. § 921.141(5)(j).  The trial court found no statutory mitigating circumstances.  It did, however, find two nonstatutory mitigators, each of which received little weight: a history of drug and alcohol abuse and a history of mental illness.

In its sentencing memorandum, the court recognized Holland's history of mental illness, but gave it little weight as a mitigating factor because he "correctly argued caselaw and factual issues to the Court. . . . The defendant's active participation during his trial and volitional decision at times not to respond to the Court outside the presence of the jury, clearly establish his ability to participate, manipulate and engineer his actions."  After weighing the evidence in aggravation and mitigation, the trial court sentenced Holland to death.

## B.

Holland appealed his conviction and sentence to the Florida Supreme Court, which affirmed.  Holland II, 773 So. 2d 1065.  As for Holland's Faretta claim, the Florida Supreme Court identified Faretta and the principles relevant to the right of self-representation and concluded that the trial court had not erred when it denied Holland's requests to represent himself:

> In issue one, Holland claims that the trial court erred in denying him the opportunity to represent himself. The trial court conducted Faretta

15

inquiries on at least two separate occasions to determine whether Holland was competent to represent himself. At the conclusion of the inquiries, the trial court denied Holland's request for self-representation.

As Holland points out, "a person need not be schooled in the law in order to competently elect to represent himself." Crystal v. State, 616 So.2d 150, 153 (Fla. 1st DCA 1993). See also Fla. R. Crim. P. 3.111(d) ("(3) Regardless of the defendant's legal skills or the complexity of the case, the court shall not deny a defendant's unequivocal request to represent him or herself, if the court makes a determination of record that the defendant has made a knowing and intelligent waiver of the right to counsel."). However, in Johnston v. State, 497 So.2d 863, 868 (Fla.1986), this Court stated that "[i]n determining whether a defendant has knowingly and intelligently waived his right to counsel, a trial court should inquire into, among other things: defendant's age, mental status, and lack of knowledge and experience in criminal proceedings." In Johnston, this Court concluded that "[t]he trial judge made the proper inquiry . . . and correctly concluded that the desired waiver of counsel was neither knowing nor intelligent, in part, because of Johnston's mental condition." Id. (emphasis added). See also Visage v. State, 664 So.2d 1101, 1101 (Fla. 1st DCA 1995).

A trial court's decision as to self-representation is reviewable for abuse of discretion. See id. at 1101. We conclude that the trial court did not abuse its discretion in denying Holland the right to represent himself. The record contains numerous instances of Holland's unstable mental condition, particularly his previous hospitalization at St. Elizabeth's. Additionally, the trial court was aware of the potential that Holland was going to rely on the insanity defense. Moreover, it is clear from Holland's responses to the trial court's inquiries that Holland lacked sufficient knowledge of criminal proceedings[.]

. . .

Finally, [the detailed explanation of the trial court on August 26, 1996,] best describes the trial court's reasons for denying Holland's requests to represent himself[.]

16

. . .

> Based on this [explanation], it is clear that the trial court properly applied the Johnston factors in denying Holland the right to represent himself. Hence, we find no merit to Holland's first claim of error.

Id. at 1069-70 (footnote omitted).  The Florida Supreme Court also ruled that the trial court committed harmless error when it admitted an inaudible videotape and opinion testimony from a psychologist about whether Holland hid the murder weapon, id. at 1072-73, 1075-76, and it ruled that statements admitted at trial were not taken in violation of Holland's right to counsel, id. at 1073-74.  The Supreme Court denied a petition for a writ of certiorari.  Holland v. Florida, 534 U.S. 834 (2001) (mem.).

Holland unsuccessfully filed a Rule 3.851 motion for postconviction relief in state trial court.  Holland appealed to the Florida Supreme Court and also filed a state habeas petition in that court.  The Florida Supreme Court denied all relief, concluding in relevant part that Holland failed to establish ineffective assistance of counsel.  Holland v. State (Holland III), 916 So. 2d 750, 758-59 (2005) (per curiam).  Again, the Supreme Court declined to hear the case.  Holland v. Florida, 547 U.S. 1078 (2006) (mem.).

Holland then filed a pro se federal habeas petition in January 2006 in the United States District Court for the Southern District of Florida.  The district court dismissed the petition as barred by the statute of limitations and the Eleventh

17

Circuit affirmed.  Holland v. Florida, 539 F.3d 1334 (11th Cir. 2008).  The Supreme Court reversed, concluding that the § 2254 one-year statute of limitations was subject to equitable tolling.  Holland v. Florida, 560 U.S. 631, 634-35 (2010).

On remand, Holland, now counseled, filed an amended federal habeas petition that contained eight claims.  The district court granted a writ of habeas corpus on his Faretta claim pursuant to 28 U.S.C. § 2254, finding that the Florida Supreme Court's decision was contrary to Faretta because it reached a different result on materially indistinguishable facts and failed to apply clearly established federal law.  The district court concluded that "Indiana [v. Edwards, 554 U.S. 164 (2008)] was not clearly established federal law at the time of Mr. Holland's direct appeal" and, therefore, was "not applicable" to the resolution of Holland's claim.  Holland v. Tucker, 854 F. Supp. 2d 1229, 1259 n.21 (S.D. Fla. 2012).  The district court also observed that its analysis would be unchanged if it applied Indiana v. Edwards because, unlike the defendant in Indiana v. Edwards, Holland did not "suffer from 'severe mental illness to the point where [he was] not competent to conduct trial proceedings by [himself].'"  Id. (quoting Indiana v. Edwards, 554 U.S. at 178).  The district court denied relief on all of Holland's other claims, but granted a Certificate of Appealability on one of the unsuccessful claims: that the Florida Supreme Court improperly applied harmless error analysis to admitted testimony from Dr. Daniel Martell.  This Court expanded the COA to include two

18

more claims: that the trial court erred in refusing to suppress Holland's custodial statement; and that guilt-phase trial counsel rendered ineffective assistance by failing to object to the prosecutor's closing argument.

## II.

We review de novo the district court's disposition of Holland's federal habeas petition. Peterka v. McNeil, 532 F.3d 1199, 1200 (11th Cir. 2008). Plainly, AEDPA applies to Holland's claims. Under AEDPA, if a petitioner's habeas claim "was adjudicated on the merits in State court proceedings," a federal court may not grant habeas relief unless the state decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Holland does not assert that the Florida Supreme Court's decision was based on an unreasonable determination of facts. "Under § 2254(d)(1)'s 'contrary to' clause, we grant relief only 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" Jones v. GDCP Warden, 753 F.3d 1171, 1182 (11th Cir. 2014) (alterations in original) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). For § 2254(d)(1), clearly

19

established federal law includes only the holdings of Supreme Court decisions --

not Supreme Court dicta and not the opinions of this Court.  White v. Woodall, 134

S. Ct. 1697, 1702 & n.2 (2014).  "Under § 2254(d)(1)'s 'unreasonable application'

clause, we grant relief only 'if the state court identifies the correct governing legal

principle from [the Supreme] Court's decisions but unreasonably applies that

principle to the facts of the prisoner's case.'"  Jones, 753 F.3d at 1182 (alteration in

original) (quoting Williams v. Taylor, 529 U.S. at 413).

The Supreme Court has interpreted § 2254(d) as requiring that "a state

prisoner must show that the state court's ruling on the claim being presented in

federal court was so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded

disagreement."  Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011).  "[A]n

'unreasonable application of' [Supreme Court] holdings must be "'objectively

unreasonable,'" not merely wrong; even 'clear error' will not suffice."  Woodall,

134 S. Ct. at 1702 (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)).  Put

differently, Holland must establish that no fairminded jurist would have reached

the Florida court's conclusion.  See Richter, 131 S. Ct. at 786-87; Holsey v.

Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1257 (11th Cir. 2012).  And

Holland must do so based only on the "record that was before the state court that

adjudicated the claim on the merits."  Cullen v. Pinholster, 131 S. Ct. 1388, 1398

20

(2011). "If this standard is difficult to meet, that is because it was meant to be." Richter, 131 S. Ct. at 786.

## III.

We turn first to the state's cross-appeal challenging the grant of habeas relief on Holland's Faretta claim. In Faretta, the Supreme Court held that the Sixth Amendment guarantees a defendant the right of self-representation in a criminal trial. 422 U.S. at 821. Because of the dangers of proceeding pro se, however, the Court imposed a substantial check: "the accused must 'knowingly and intelligently' forgo" the traditional benefits associated with the right to counsel. Id. at 835. "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation," the Court explained, "he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" Id. (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1942)). The Supreme Court held that the defendant had knowingly and voluntarily waived his right to counsel when the record showed he "was literate, competent, and understanding, and that he was voluntarily exercising his informed free will." Id. The defendant need not have "mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire" because "his technical legal

21

knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself." Id. at 836.

After thorough review of the entire record, we are satisfied that the Florida Supreme Court's Faretta determination was the final merits adjudication of Holland's Faretta claim; that the Florida Supreme Court's decision was neither contrary to nor an unreasonable application of Faretta and its progeny; that Florida's high court properly considered Holland's mental condition in making the Faretta calculus; and finally that, in light of the Supreme Court's holding in Indiana v. Edwards, 554 U.S. 164, Holland is not being held in violation of the Constitution.

We begin by observing that the Florida Supreme Court cited to and applied controlling Supreme Court law as explicated in Faretta. The Florida Supreme Court cited to both Faretta and state law similar to Faretta in rejecting Holland's self-representation claim. The court observed that "a person need not be schooled in the law in order to competently elect to represent himself," quoting a Florida case premised on the holding in Faretta. Holland II, 773 So. 2d at 1069 (quoting Crystal v. State, 616 So. 2d 150, 153 (Fla. Dist. Ct. App. 1993)). It also cited to a Florida rule of criminal procedure: "Regardless of the defendant's legal skills or the complexity of the case, the court shall not deny a defendant's unequivocal request to represent him or herself, if the court makes a determination of record

22

that the defendant has made a knowing and intelligent waiver of the right to counsel." Id. at 1069 (quoting Fla. R. Crim. P. 3.111(d)(3) (1998)). The court explained that, in determining whether a waiver is knowing and voluntary, a trial court should inquire into the "defendant's age, mental status, and lack of knowledge and experience in criminal proceedings." Id. (quoting Johnston v. State, 497 So. 2d 863, 868 (Fla. 1986)). It specifically referenced a Florida case holding that "the desired waiver of counsel was neither knowing nor intelligent, in part, because of [the defendant's] mental condition." Id. (quoting Johnston, 497 So. 2d at 868).

The Florida Supreme Court concluded that the trial court did not abuse its discretion in refusing to allow Holland to represent himself. According to the court, "[t]he record contains numerous instances of Holland's unstable mental condition, particularly his previous hospitalization at St. Elizabeth's." Id. "[T]he trial court was aware of the potential that Holland was going to rely on the insanity defense." Id. And "it is clear from Holland's responses to the trial court's inquiries that Holland lacked sufficient knowledge of criminal proceedings." Id. The Florida Supreme Court also quoted from the trial court's March 22, 1996, Faretta inquiry, in which Holland admitted he had little legal knowledge and no training, and from the trial court's August 26 explanation of its reasons for denying Holland's requests to represent himself, which mentioned his head injury, his

23

hospitalization at Saint Elizabeth's, his removal from the courtroom during his previous trial, and his reliance on the insanity defense. Id. at 1069-70. The Florida Supreme Court concluded that the trial court did not abuse its discretion in denying Holland's attempts at self-representation, because "it is clear that the trial court properly applied the Johnston factors in denying Holland the right to represent himself." Id. at 1070.

Though the Florida Supreme Court examined the Faretta question through the lens of abuse-of-discretion review, we remain satisfied that the federal constitutional claim "was adjudicated on the merits" for purposes of § 2254(d). Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013); see Richter, 131 S. Ct. at 784-85. The Florida Supreme Court described the trial court's questioning of the defendant as Faretta inquiries and cited that Supreme Court precedent. Holland II, 773 So. 2d at 1069 & n.2, 1070. Moreover, the state precedents applied by the Florida Supreme Court expressly referenced Faretta in requiring a knowing and intelligent waiver. See Crystal, 616 So. 2d at 152; Johnston, 497 So. 2d at 867-68. Like in Johnson v. Williams, Holland "treated [his] state and federal claims as interchangeable, and it is hardly surprising that the state courts did so as well." 133 S. Ct. at 1099. Ultimately, "the fact that the [state and federal] claims are so similar makes it unlikely that the [Florida Supreme Court] decided one while overlooking the other." Id. at 1098; see Childers v. Floyd, 736 F.3d 1331, 1335

24

(11th Cir. 2013) (en banc).

In addition, we review the Florida Supreme Court's decision, rather than the decision of the trial court. As a rule, we review "the highest state court decision reaching the merits of a habeas petitioner's claim." Hittson v. GDCP Warden, 759 F.3d 1210, 1231 (11th Cir. 2014). In Hittson, we held that the Georgia Supreme Court's denial of a certificate of probable cause for an appeal constituted an adjudication of the petitioner's claims on the merits because the court reviewed the record and concluded that his claims lacked arguable merit. Id. at 1231-32. Similarly, the Florida Supreme Court's rejection of Holland's Faretta claim based on the substantial body of evidence reflecting his mental condition plainly constituted an adjudication of that claim on the merits. Moreover, we have also held that "when a state appellate court applies plain-error review and in the course of doing so, reaches the merits of a federal claim . . . that decision is an adjudication 'on the merits.'" Lee v. Comm'r, Ala. Dep't of Corr., 726 F.3d 1172, 1210 (11th Cir. 2013). Although the Florida Supreme Court's use of an abuse-of-discretion standard "might have made it more difficult for [Holland] to succeed on direct appeal," the Florida Supreme Court's decision remains the relevant adjudication for the purposes of our review. Id.; see also Renico v. Lett, 559 U.S. 766, 772-73 (2010) (applying AEDPA deference to a state supreme court decision using an abuse-of-discretion standard); Troy v. Sec'y, Fla. Dep't of Corr., 763 F.3d

25

1305, 1311-12 (11th Cir. 2014) (same).  Even now Holland does not dispute that the Florida Supreme Court's decision was the last state court adjudication of his federal Faretta claim on the merits, and it is that decision that we must afford deference under AEDPA.

Nor was it contrary to clearly established Supreme Court law for the Florida Supreme Court to apply an abuse-of-discretion standard in reviewing Holland's Faretta claim.  The Supreme Court has never held that state appellate courts must review a defendant's Faretta claim de novo, rather than under an abuse-of-discretion standard, even if we would normally apply de novo review to such claims on direct appeal.  See Woodall, 134 S. Ct. at 1702 & n.2 (stating that only Supreme Court holdings, and not dicta or holdings of lower courts, constitute clearly established law).  Furthermore, the Supreme Court has held that a state appellate court's use of an abuse-of-discretion standard to review the denial of a defendant's post-waiver request for counsel is not contrary to clearly established law.  Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013).  Under § 2254(d)(1), then, Holland must demonstrate that the Florida Supreme Court's denial of his self-representation claim was contrary to or an unreasonable application of Faretta.  He cannot.

Reading the Florida Supreme Court's decision as a whole, we conclude that it was not contrary to clearly established Supreme Court law because "neither the

26

reasoning nor the result of the state-court decision contradicts" Faretta or its progeny. Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam). The Florida Supreme Court took Holland's mental condition into account as part of the knowing and voluntary waiver analysis. Supreme Court precedent did not (and still does not) forbid this practice. See, e.g., Fitzpatrick v. Wainwright, 800 F.2d 1057, 1065 (11th Cir. 1986) ("[T]he Supreme Court has not precisely defined the extent of the Faretta inquiry . . . ."). To the contrary, the Supreme Court had instructed that "mental capacity" is relevant to determining whether a waiver of the right-to-counsel during police interrogation is knowing and voluntary. Moore v. Michigan, 355 U.S. 155, 164-65 (1957); see Johnson v. Zerbst, 304 U.S. 458, 464 (1938) ("The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."). Faretta itself noted that the defendant was "literate, competent, and understanding" and "voluntarily exercising his informed free will." 422 U.S. at 835 (emphasis added). And in Godinez v. Moran, 509 U.S. 389 (1993), the Court explained that "[a] finding that a defendant is competent to stand trial . . . is not all that is necessary before he may be permitted to . . . waive his right to counsel" because "a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." Id. at 400. In other words, the Court emphasized,

27

"when a defendant seeks to waive his right to counsel, a determination that he is competent to stand trial is not enough; the waiver must also be intelligent and voluntary before it can be accepted." Id. at 402.

This conclusion is confirmed by the Supreme Court itself in Indiana v. Edwards, which held that a state may deny a defendant the right to represent himself when he is not mentally competent to conduct a trial himself, even if he is competent to stand trial. 554 U.S. at 178. Indiana v. Edwards provides an authoritative statement from the Supreme Court about what its earlier cases did and did not clearly establish. Indiana v. Edwards concluded that the Court's prior cases had not clearly established whether "the Constitution permits a State to limit [a] defendant's self-representation right . . . on the ground that the defendant lacks the mental capacity to conduct his trial defense unless represented." Id. at 174. The Court observed that nothing in Faretta or Godinez provided a definitive answer to that question, id. at 170-74, although those cases did "point[] slightly" in favor of the Court's ultimate holding, id. at 174. Accordingly, whether a state could limit a defendant's self-representation right because of concerns about his mental condition was an open question at the time the Florida Supreme Court decided Holland's direct appeal. We can hardly fault the Florida Supreme Court for being prescient and reaching the very same answer reached by the Supreme Court eight years later.

28

However, the district court found that the Florida Supreme Court's decision was contrary to Faretta because the facts were materially indistinguishable. Not so. Voluminous record evidence calling Holland's mental health into serious question makes the facts in this case substantially and meaningfully different from Faretta, where the Court made no mention of any concerns about the defendant's psychological condition or his mental disabilities. Cf. Andrade, 538 U.S. at 74 (facts not materially indistinguishable from precedent); Putman v. Head, 268 F.3d 1223, 1242 (11th Cir. 2001) (same).

Nor, as we see it, did the Florida Supreme Court unreasonably apply Faretta when it determined that, considering his mental condition, Holland failed to knowingly and voluntarily waive his right to counsel. As we have recounted, the trial court and the Florida Supreme Court knew Holland was diagnosed with and treated for schizophrenia for a number of years at a psychiatric hospital in Washington, D.C., in the decade before the murder of Officer Winters. Indeed, he was housed at the hospital because a judge had found him not guilty of a robbery charge on account of insanity. Doctors treating Holland were not sure whether his symptoms were also tied to organic psychosis from a severe brain injury he suffered during earlier imprisonment. After fleeing from the hospital, he was forced to return after being found insane by another judge on another robbery charge. When he absconded a second time he moved to Florida, where he killed

29

Officer Winters. During his first trial for that murder he pled insanity. In fact, at the time Holland asked to represent himself his lawyer had filed notice of his intent to again raise an insanity defense.

Moreover, as we've noted, at a hearing on Holland's competency to stand trial for murder, the trial court heard that a jail psychiatrist recently had diagnosed Holland with an unspecified psychotic disorder and with anti-social personality disorder. The doctor prescribed Haldol, an antipsychotic, which Holland said he was not taking. The court heard that failure to take antipsychotic medication could cause Holland's condition to deteriorate. Holland also complained to one mental health expert about "burning" in his mind that affected his thoughts and actions. Though Holland had not been disruptive during pretrial hearings, his unstable behavior had forced his removal from the initial trial. And, indeed, the trial court saw Holland's apparent paranoia firsthand. Time and again he complained to the court that he was being taped by his own attorney and others. Holland worried they had installed listening devices in his cell to eavesdrop on his conversations with invisible people. He was convinced that attorneys on both sides were colluding with the judge to sentence him to death.

This record evidence suggests that Holland's troubled mental condition kept him from fully grasping "the dangers and disadvantages of self-representation." Faretta, 422 U.S. at 835. In other words, a court could reasonably determine -- as

30

the Florida Supreme Court did -- that he did not make a choice to waive his right to

counsel "with eyes open."  Id. (quotation omitted).  Far from containing mere

relics of a past history of mental illness, the substantial record sheds light on

Holland's condition at the time he attempted to waive the right to counsel.

Holland's mental disorder diagnoses were consistent with his persistent troubled

behavior.  And while pleading insanity standing alone does not disqualify a

defendant from representing himself, a reasonable court could look to Holland's

previous insanity adjudications, alongside his intention to plead insanity for a

crime that occurred a decade later, as strong signals of an ongoing mental

condition directly affecting his current ability to waive the right to counsel

knowingly and voluntarily.

The district court erred in placing disproportionate emphasis on the trial

court's determination that Holland was competent to stand trial.  The Florida

Supreme Court did not base its denial of Holland's Faretta claim on a finding of

incompetence.  Instead, it concluded that Holland was not deprived of the right to

self-representation because, considering his mental condition, Holland did not

make a knowing and voluntary waiver of the right to counsel.  Holland may have

been able to appreciate the basic structure of the trial process, but a reasonable

court still could conclude that, considering his schizophrenia or organic brain

condition, Holland did not fully appreciate the significance of taking on the

31

daunting task of self-representation.  See Faretta, 422 U.S. at 835; cf. Indiana v. Edwards, 554 U.S. at 173 ("One might not be insane in the sense of being incapable of standing trial and yet lack the capacity to stand trial without benefit of counsel." (alteration omitted) (quoting Massey v. Moore, 348 U.S. 105, 108 (1954))).  Similarly, the fact that the trial court found Holland knowingly and intelligently waived other rights -- including the right against self-incrimination -- does not show he also knowingly and intelligently waived the right to counsel.  A defendant may understand the act of testifying at trial but not grasp the significance of self-representation.  A reasonable court could conclude Holland knowingly and voluntarily waived one but not the other.

Nevertheless, Holland places great emphasis on the fact that the trial court did not discuss Holland's mental condition when it refused to allow him to represent himself on March 22 and August 2, 1996.  Holland argues that the refusal of the right to self-representation on these dates amounted to separate and discrete Faretta violations, and that the trial court's failure to discuss his mental condition in its earlier rulings revealed that his psychological state was used as a post hoc justification.  We remain unpersuaded.  Holland does not identify any clearly established Supreme Court rule that prohibited the Florida Supreme Court from conducting a consolidated waiver analysis that examined the entire record, including the trial court's August 26 discussion of Holland's mental state along

32

with the number of other occasions on which he requested to represent himself.

Nor, reading the Florida Supreme Court's opinion as a whole (as we must), do we believe the court impermissibly relied on Holland's lack of "technical legal knowledge, as such," Faretta, 422 U.S. at 836, in rejecting his Faretta claim. We do not read state court opinions as if we were "grading papers," and must apply AEDPA deference absent a "conspicuous misapplication of Supreme Court precedent." Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 785-86 (11th Cir. 2003) (quotation omitted). A careful reading of the Florida Supreme Court's decision reveals that Holland's mental condition was the primary basis for its ruling. As we have recounted, the Florida Supreme Court began its analysis by agreeing that a defendant need not possess any legal skills to choose self-representation, and cited to a Florida case and a Florida rule of criminal procedure making that essential point. The court then cited to still another of its cases, Johnston, 497 So. 2d at 868, holding that a defendant could not knowingly and intelligently waive his right to counsel given his mental condition -- a phrase which the Florida Supreme Court notably emphasized.[3] The court observed that the

---

[3] Holland places weight on the fact that the Florida Supreme Court cited Johnston, a case which preceded an amendment to Florida's rules of criminal procedure. The amendment clarified that courts cannot consider a defendant's ability to prepare an effective defense in deciding whether a defendant may waive his right to counsel. See McKenzie v. State, 29 So. 3d 272, 280-82 (Fla. 2010) (per curiam). The Florida Supreme Court has continued to cite Johnston and related cases for the proposition that a defendant's mental condition may be relevant to whether the defendant

33

record "contain[ed] numerous instances of Holland's unstable mental condition, particularly his previous hospitalization at St. Elizabeth's" and his intent to rely on the insanity defense. Holland II, 773 So. 2d at 1069. The Florida Supreme Court concluded by quoting at length a passage from the trial court's August 26 colloquy which "best describe[d]" that court's reasoning, and which relied substantially on Holland's mental condition. Id. at 1070.

Though the Florida Supreme Court also concluded that Holland lacked "sufficient knowledge of criminal proceedings," id. at 1069, we do not read this to mean that the court required Holland to show any technical legal knowledge in order to represent himself. Instead, we take this to mean that Holland could not fully appreciate "the dangers and disadvantages of self-representation." Faretta, 422 U.S. at 835; see Fitzpatrick, 800 F.2d at 1065-67. In some ways, the Florida Supreme Court's analysis resembles Johnson v. Zerbst, where the Supreme Court long ago instructed that the waiver inquiry turns "upon the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." 304 U.S. at 464. Reading the Florida Supreme Court's opinion as a whole, including its observation at the outset that the defendant's legal skills are irrelevant to the Faretta inquiry, we construe its comments about

---

has knowingly and voluntarily waived his right to counsel. See, e.g., Alston v. State, 894 So. 2d 46, 57 (Fla. 2004) (per curiam).

34

Holland's lack of legal knowledge as going to its conclusion that Holland could not comprehend the daunting task of self-representation, and, therefore, could not "knowingly and intelligently" waive his right to counsel "with eyes open." Faretta, 422 U.S. at 835 (quotation omitted).

Indeed, the Florida Supreme Court has said time and again that it does not consider the defendant's technical legal knowledge in making the Faretta determination. See, e.g., Weaver v. State, 894 So. 2d 178, 193 (Fla. 2004) (per curiam) ("The focus of a Faretta hearing under rule 3.111 is whether a defendant is competent to waive the right to counsel, not whether he is competent to provide an adequate defense."); Bell v. State, 699 So. 2d 674, 677 (Fla. 1997) (per curiam) ("Technical legal knowledge is not the criterion for assessing the knowing exercise of a defendant's right to defend himself."); Hill v. State, 688 So. 2d 901, 905 (per curiam) (Fla. 1996) ("We emphasize that a defendant does not need to possess the technical legal knowledge of an attorney before being permitted to proceed pro se."). And when the Florida Supreme Court has evaluated the defendant's legal experience, it has done so for the purpose of ascertaining whether he appreciates the palpable dangers surrounding self-representation. See, e.g., Potts v. State, 718 So. 2d 757, 760 (Fla. 1998) ("Competent substantial evidence supports the conclusion that Potts had a general understanding of his rights and that his decision to proceed without counsel was made with eyes open."); Rogers v. Singletary, 698

35

So. 2d 1178, 1181 (Fla. 1996) ("We find that the Faretta standards were met in the instant case because the record establishes that Rogers knew what he was doing and his choice was made with eyes open.").

In sum, we cannot say that it was contrary to clearly established law for the Florida Supreme Court to uphold the trial court's determination that Holland's serious psychological issues kept him from making a knowing and voluntary waiver. Nor can we say that there was any clearly established law preventing the Florida Supreme Court from considering his mental condition in its Faretta calculus.[4]

We also cannot agree with the district court that Indiana v. Edwards has no application to Holland's claim. The Supreme Court's decision in Indiana v. Edwards provides an alternative basis for the denial of Holland's habeas petition. 554 U.S. 164. Under the plain language of 28 U.S.C. § 2254(a), we may only grant the writ if the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." See also 28 U.S.C. § 2241(c)(3) (2012) ("The writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution."). Furthermore, the purpose of the great writ is to provide a remedy for actual violations of constitutional rights, rather than to allow

---

[4] We also note that the state court's reference to Holland's improper behavior is a relevant consideration. Faretta itself said that "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." Faretta, 422 U.S. at 834 n.46.

36

petitioners to stake claims based on precedent that has since been narrowed or overruled. See, e.g., Brecht, 507 U.S. at 621 (describing the purpose of habeas corpus as "affording relief only to those grievously wronged").

Relief is therefore only available to a petitioner whose constitutional claim has not been rendered nugatory by subsequent Supreme Court precedent, as a number of our sister circuits have concluded. See, e.g., Desai v. Booker, 538 F.3d 424, 427 (6th Cir. 2008) (holding that a habeas petitioner may not "obtain relief on the basis of a state court's allegedly unreasonable application of a Supreme Court precedent . . . that no longer is good law"); Delgadillo v. Woodford, 527 F.3d 919, 927-28 (9th Cir. 2008) ("[T]he purpose of the Teague [v. Lane, 489 U.S. 288 (1989)] non-retroactivity rule is to protect state interests."); Moore v. Anderson, 222 F.3d 280, 285 (7th Cir. 2000) ("[T]he principle of non-retroactivity favors only the state . . . ."); Flamer v. State of Del., 68 F.3d 710, 725 n.15 (3d Cir. 1995) (explaining that a case could be applied retroactively because it "did not work a change in the law favoring criminal defendants"). As we have held in the context of ineffective assistance of counsel claims, Holland "must show not only that he could have successfully challenged" the trial court's rejection of his request to represent himself in 2000, "but also that the basis of that challenge would be recognized as valid under current law." Allen v. Sec'y, Fla. Dep't of Corr., 611 F.3d 740, 753-54 (11th Cir. 2010); see Lockhart v. Fretwell, 506 U.S. 364, 372

37

(1993).

The current law includes Indiana v. Edwards, where the Supreme Court unambiguously held that courts may consider a defendant's mental condition in evaluating whether he should be permitted to proceed to trial without counsel. 554 U.S. at 167. The Supreme Court discussed at length the risk that allowing a mentally ill defendant to represent himself could lead to an unfair and humiliating spectacle of a trial, and concluded that a state may insist that a defendant who "suffer[s] from severe mental illness" be represented by counsel. Id. at 176-78. Indiana v. Edwards also instructs us that the trial judge "will often prove best able to make more fine-tuned mental capacity decisions." Id. at 177.

The simple fact is that, in the light of Indiana v. Edwards, Holland is not being held in violation of the Constitution. The facts of Indiana v. Edwards bear similarity to those here: like Holland, Edwards had been diagnosed with schizophrenia and previously committed to a mental institution, and the Indiana trial court therefore determined that he was incompetent to represent himself. Id. at 167-69. Although the district court mentioned that Holland was unlike the defendant in Indiana v. Edwards, the record belies this conclusion. The Florida Supreme Court stressed the importance of Holland's mental condition in its analysis and specifically mentioned that "[t]he record contain[ed] numerous instances of Holland's unstable mental condition." Holland II, 773 So. 2d at 1069-

38

70.  In the face of the substantial body of evidence demonstrating Holland's serious mental disabilities before both the Florida Supreme Court and the trial court, we do not see how Holland is currently being held in violation of the Constitution.  To put it another way, we cannot fault the Florida Supreme Court for refusing to risk the very sort of trial the Supreme Court feared in Indiana v. Edwards.  And we have little doubt that if the trial court had allowed Holland to represent himself, and the jury had convicted him, the claim today would be that he was in no condition to waive his right to counsel in a capital case.  We conclude, therefore, that Holland's claim is unavailing, whether we measure the Florida Supreme Court's decision against Faretta or examine it under Indiana v. Edwards, and thus reverse the district court's grant of habeas relief on Holland's Faretta claim.

## IV.

Holland appeals the district court's denial of habeas relief on three other claims.  We affirm as to each.

## A.

First, Holland says that the Florida Supreme Court unreasonably applied clearly established Supreme Court law when it concluded that the admission of an inaudible video and improper expert testimony had been harmless errors.  A state court can find a federal constitutional error harmless only by concluding "it was

39

harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). Holland does not dispute that the Florida Supreme Court properly identified the Chapman rule. Instead, he argues that the Florida Supreme Court unreasonably determined that the State showed harmlessness beyond a reasonable doubt when it rejected two of his constitutional claims.

However, on federal habeas review, a federal constitutional error is harmless unless there is "actual prejudice," meaning that the error had a "substantial and injurious effect or influence" on the jury's verdict. Brecht, 507 U.S. at 637 (quotation omitted). Harmlessness under the Brecht standard is a question of law that we review de novo. Vining v. Sec'y, Dep't of Corr., 610 F.3d 568, 571 (11th Cir. 2010) (per curiam); Prevatte v. French, 547 F.3d 1300, 1305 (11th Cir. 2008). "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman." Fry v. Pliler, 551 U.S. 112, 121-22 (2007). Because of the "[s]tates' interest in finality," the states' "sovereignty over criminal matters," and the limitation of habeas relief to those "grievously wronged," the Supreme Court set out in Brecht a standard that is more favorable to and "less onerous" on the state, and thus less favorable to the

40

defendant, than the usual harmless beyond a reasonable doubt standard.  Brecht, 507 U.S. at 637; accord Fry, 551 U.S. at 117.  The Supreme Court explained in Brecht that "collateral review is different from direct review," and, therefore, that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment."  507 U.S. at 633-34 (quotation omitted).  Thus, we, as a federal habeas court, "may deny habeas relief based solely on a determination that the constitutional error [was] harmless under the Brecht standard."  Mansfield v. Sec'y, Dep't of Corr., 679 F.3d 1301, 1308 (11th Cir. 2012).

1.

During the guilt phase, the State showed the jury a videotape of Holland's interrogation.  The jury could hear most of the questions asked by the interrogating detective, but the tape's poor audio quality prevented jurors from hearing most if not all of Holland's answers.  The Florida Supreme Court on direct appeal agreed that the tape should not have been admitted because it "allowed the jury to speculate what the defendant's answers were to these questions, a result which was prejudicial to the defendant."  Holland II, 773 So. 2d at 1072.  But the Florida Supreme Court "conclude[d] beyond a reasonable doubt that the error in admitting the tape did not affect the jury verdict" because "the interrogating detective properly testified regarding what Holland said to him during the interrogation."  Id.

41

at 1073.

Though Holland concedes that the detective fully testified to what Holland said on the videotape, he argues that the inaudible tape could have led the jury to speculate about how Holland delivered his responses. This is far too slender a reed for Holland to show the Florida Supreme Court's harmlessness determination was unreasonable. In his testimony, Detective Butler guided jurors through the tape, reporting Holland's responses answer-by-answer. Later, Holland himself explained the inaudible statements to jurors. Holland offers no reason to think that the jury speculated about how he delivered the words when he and the officer testified to his statements. And he points to nothing that suggests any such speculation affected the outcome.

Holland also complains that the prosecutor emphasized the importance of the videotape during closing arguments when he told jurors to review the video carefully and to look for Holland's demeanor. But the interrogation itself and Holland's statements to detectives were not unfairly prejudicial. Again, the only potential prejudice Holland alleges came from the threat that jurors might speculate about the content of his inaudible responses. Because the officer's fulsome testimony defused that risk, discussion of the video in closing argument was not prejudicial. Thus, we cannot say that it was unreasonable for the Florida Supreme Court to determine that admission of the videotape alongside the trial testimony

was harmless beyond a reasonable doubt, let alone that the admission of this evidence amounted to "actual prejudice" -- that is, that the error had a "substantial and injurious effect or influence" on the jury's verdict. Brecht, 507 U.S. at 637 (quotation omitted).

2.

Police found Officer Winters's weapon between rocks in a field near the murder scene. Holland II, 773 So. 2d at 1075. Psychologist Dr. Daniel Martell, a prosecution expert witness called during the guilt phase to rebut Holland's insanity defense, opined based on a photograph of the location where the firearm was found that the gun had been hidden by Holland, not randomly dropped. Id. The Florida Supreme Court on direct appeal found that "Dr. Martell was not qualified as an expert in crime scene evidence" and that the trial court "should not have allowed Dr. Martell to give his opinion as to whether the gun was placed or randomly dropped." Id. Nevertheless, the Florida Supreme Court concluded that the error was harmless because another witness, Deputy McDonald, testified without objection that he believed the gun was placed between rocks, not dropped. Id. at 1075-76.

Holland argues that the Florida Supreme Court unreasonably applied Chapman because Holland's mental state was sharply contested and improper opinion testimony from a psychologist could have influenced the jury on the issues

43

of sanity or the degree of the offense. But Dr. Martell's improper opinion simply repeated the testimony of the officer who found the gun. The officer said he believed the gun was placed between the rocks where it was found rather than dropped. Holland II, 773 So. 2d at 1075-76. The officer illustrated his account with crime scene photos that allowed the jury to decide for itself whether the gun had been hidden. While it is theoretically possible that the mental health expert's opinion about the gun spoke to Holland's psychological condition, a court could reasonably conclude that it had at most a slight and attenuated impact. As a result, we are compelled to conclude not only that it was not objectively unreasonable for the Florida Supreme Court to conclude that the admission of this opinion testimony was harmless beyond a reasonable doubt, Andrade, 538 U.S. at 75, but also that the error did not have a "substantial and injurious effect or influence" on the jury's verdict, Brecht, 507 U.S. at 637 (quotation omitted).

## B.

Holland also argues that the Florida Supreme Court unreasonably applied Strickland when it rejected his claim that trial counsel was ineffective for failing to object to comments by the prosecutor during guilt-phase closing arguments. The state postconviction court summarily denied Holland's claim. Instead of appealing the merits of the state habeas trial court's rejection of his ineffectiveness claim, Holland invoked Florida Rule of Criminal Procedure 3.850 in challenging that

44

court's failure to attach to its summary denial portions of the record refuting the allegations.  Nevertheless, the Florida Supreme Court went to the merits and refused relief on the ground that Holland established neither deficient performance nor prejudice.  Holland III, 916 So. 2d at 758-59.

The district court held that Holland failed to exhaust his claim in state court because his state appeal did not pursue the merits of his claim.  We disagree.  For a number of reasons, exhaustion is not a bar to Holland's claim.  Foremost, the exhaustion requirement is satisfied if a claim is "fairly presented" to the state court that had "an opportunity to apply controlling legal principles to the facts bearing upon [it]."  Picard v. Connor, 404 U.S. 270, 275, 277 (1971) (quotation omitted).  The Florida Supreme Court had "an opportunity to address [Holland's] claims in the first instance" when it rejected the merits of his Strickland claim.  Cone v. Bell, 556 U.S. 449, 465 (2009) (quotation omitted).  The district court's exhaustion decision also is in tension with our precedent recognizing that a petitioner exhausted state remedies by filing a similar 3.850 appeal.  See Henry v. Dep't of Corr., 197 F.3d 1361, 1368 (11th Cir. 1999) ("Henry's state-court appeal, which requested only the evidentiary hearing denied by the trial judge, was . . . appropriately modest.  It asked for the most he could reasonably have expected from the appeals court . . . .  Exhaustion should not be construed to mandate more.").  Moreover, the State agrees that Holland exhausted his claim and has now

45

expressly waived the exhaustion requirement through counsel. See 28 U.S.C. § 2254(b)(3); Holladay v. Allen, 555 F.3d 1346, 1348 n.1 (11th Cir. 2009). Exhaustion presents no obstacle to Holland's habeas petition.

Nevertheless, we affirm the district court's denial of relief on the alternative ground that Holland cannot satisfy § 2254(d). See, e.g., Powers v. United States, 996 F.2d 1121, 1123 (11th Cir. 1993) (affirming dismissal of an action "for reasons other than those used by the district court"). In the interest of judicial economy, we decline to remand the issue to the district court because we can reach a decision on the record before us. See Perkins v. Matthews, 400 U.S. 379, 386-87 (1971).

Strickland requires that Holland establish "both that his counsel provided deficient assistance and that there was prejudice as a result." Richter, 131 S. Ct. at 787. "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" Id. (quoting Strickland, 466 U.S. at 688). Prejudice requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Richter, 131 S. Ct. at 792. "The standards created by Strickland and

46

§ 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Id. at 788 (citations omitted).

In his amended federal habeas petition and his appellate brief, Holland alleged that his counsel was ineffective for failing to object to six prosecution statements made during closing arguments. As we have recognized, "[a]n objectively reasonable trial lawyer could" believe that "cases must be won at trial, not on appeal, and prefer[] not to make objections during closing argument unless the objection is a strong one." Zakrzewski v. McDonough, 455 F.3d 1254, 1259-60 (11th Cir. 2006). It was not unreasonable for the Florida Supreme Court to find no performance violations and no resulting prejudice.

1.

During the State's closing argument, the prosecutor said that Officer Winters had radioed, "I've been shot. He's got my gun. Running west." In fact, Winters stated, "He's westbound. I've been shot." Holland argues that the misstatement was more favorable to the State's theory that Holland robbed Winters of the weapon.

Immediately after misquoting Winters, the prosecutor told jurors to examine the evidence themselves: "Listen to [the video tape], it's fifty seconds. . . . Just by listening to the tape you can hear Officer Winters is obviously in a struggle." Three eyewitnesses had already testified that Holland did indeed take Winters's

gun and shoot him with it. And the judge specifically instructed jurors that the attorneys' arguments were not evidence and that jurors had to rely on their memory of the evidence. The Florida Supreme Court reasonably determined that the failure to object was not deficient performance and caused Holland no prejudice.

2.

During his closing argument, Holland's trial counsel asserted that the only reason Holland was charged with a robbery was to create a predicate offense for first-degree murder. The State responded, "[t]he reason the robbery is in the indictment is because the robbery occurred; he took the gun away by force, violence, and assault." Holland claims that his trial counsel was ineffective for failing to challenge this response as improperly professing the prosecutor's personal belief in Holland's guilt.

In context, the prosecutor's comment amounted to an assertion that the State had no improper motives for charging the robbery. A court could reasonably find no performance violation because the remark fell within the "doctrine of fair reply," which recognizes that a "prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." United States v. Hiett, 581 F.2d 1199, 1204 (5th Cir. 1978).[5] Holland also fails to show prejudice because a

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

48

court could reasonably find no effect on the trial's outcome.

3.

Holland next claims that trial counsel was ineffective for failing to object when the State improperly shifted the burden of proof on the insanity defense in its guilt-phase closing argument that "[t]here has been no person to ever say in this courtroom or anyone that testified out of this courtroom, who ever said that the defendant, Albert Holland, didn't know the difference or the consequences of his actions, except for Doctor Love." The Florida Supreme Court did not unreasonably apply Strickland in rejecting this claim on both performance and prejudice grounds because the prosecutor's comment did not purport to establish who bore the burden of proof. It merely summarized the evidence on Holland's mental state.

Holland also suggests that the prosecutor shifted the burden to the defense to prove his innocence and vouched for the truthfulness of the police by saying "I'd like to know what police officer wasn't objective and what police officer did you hear that came in to testify that did anything wrong? . . . And where is this big lie? What is the lie? I still haven't heard it." The prosecutor also said, "You haven't heard anything other than Pompano [police] or anyone else being fair in the presentation of this case." Notably, these comments came in response to defense arguments that police officers had lied in their testimony and that their

49

investigation and methods could not be trusted.  Holland comes nowhere close to meeting our doubly deferential standard for assessing deficient performance.  A court reasonably could conclude that a reasonable attorney would have declined to object because the comments were a fair reply.  Holland also fails to demonstrate that the Florida Supreme Court acted unreasonably in determining that Holland suffered no prejudice from counsel's decision not to object.

4.

Holland also faults his trial counsel for failing to object to comments from the prosecutor that referred to Holland as a liar and sociopath and called his defenses ridiculous.  Holland is not entitled to relief.  The prosecutor simply reported that its expert witness, Dr. Martell, had diagnosed Holland with psychopathy.  Earlier in the trial Martell testified about the results of a two-hour test, the "Psychopathy Check List Revised," for which Holland received a 34 out of 40, "a very high score" on the psychopathy scale.  According to Dr. Martell, Holland had exhibited a grandiose sense of himself, pathological lying, manipulative behavior, a shallow emotional affect, poor behavioral controls, and failure to accept responsibility for his own actions.  The prosecutor also referenced the fact that Holland ran, hid, and lied after committing the crimes.  And it is far from obvious that the prosecutor's "ridiculous" comment was an improper attempt to discredit Holland's defense.  In context, the plainest interpretation of the remark

suggests the prosecutor was using evidence to question the credibility of Holland's account of the crime.[6] Again, a determination that there was neither a performance violation nor prejudice was not an unreasonable one.

5.

Next, Holland argues his trial counsel should have objected when the prosecutor impermissibly vouched for the credibility of an eyewitness (Abraham Bell) by saying his testimony "was almost like a videotape. He didn't see parts of it like some of the other witnesses, he saw the entirety of the transaction." The prosecutor then described the witness's testimony: "he said from the very get go, after Albert Holland swung his fists at Officer Winters' [sic] head, he continually struggled with him and went for that gun and snatched at it and held it, and even brought it around to the front of him and pulled it out and just fired into his body."

Holland's argument does not meet the doubly deferential standard. A court reasonably could conclude that a reasonable attorney would have chosen not to object to this statement because it amounted to no more than fair comment about

---

[6] The prosecutor argued:

> Listen to that [tape], it's fifty seconds. And it's important to listen to that because when the defendant took the stand -- and by the way, you have to view and consider his testimony, his credibility, just like any other witness -- and he took the stand and told you, listen to this tape that when he started that broadcast, "1094, Code 3. He's in custody." He was still in the patrol car.

> Well, I submit to you that is ridiculous. Just by listening to the tape you can hear Officer Winters is obviously in a struggle. And "1094, Code 3" means, lights and sirens, I need a back up right now.

51

testimony received in evidence.  After all, the statement reasonably can be read not to personally vouch for the witness but to argue that the testimony was particularly probative because it captured all of the key events of the crime.  See, e.g., United States v. Fuentes, 877 F.2d 895, 901 (11th Cir. 1989) ("A review of the contested language in context reveals that the government's attorney was properly arguing the credibility of the witness based on the evidence in the record.").  The prosecutor suggested that the nature and scope of Bell's testimony established its credibility.  He did not profess a personal opinion about its truth.  Again, the determination was neither contrary to nor an unreasonable application of Strickland.

6.

Finally, Holland claims that his attorneys were ineffective because they did not object to the State's comments on Holland's post-arrest silence.  Describing Holland's interrogation, the prosecutor said, "when he's talking to Albert Holland, Albert Holland doesn't tell him about the beating of Thelma Johnson.  He said he had sex with a woman a while ago."  "He didn't say anything about the beating of Thelma, but he did make up an excuse of the shooting [of] Officer Winters."

A reasonable court could recognize that the prosecutor's argument did not concern Holland's constitutionally protected right against self-incrimination.  After all, the prosecutor was commenting on the statement Holland did make to police.

52

The prosecutor argued that the story Holland told to police could not be believed because it was inconsistent with other evidence that showed Holland beat Thelma Johnson. The prosecutor took Holland to task for what he told police, not for exercising his right to remain silent. Again, Holland has not established that the state court determination was contrary to or an unreasonable application of Supreme Court law.

## C.

Holland also claims that the Florida Supreme Court unreasonably applied Supreme Court precedent when it found no error in the suppression of his custodial statements. At the suppression hearing,[7] Officer Wesolowski testified that, when arrested on July 29, 1990, Holland spoke Spanish to police and identified himself as "Antonio Rivera." After a Spanish-speaking officer translated Miranda warnings to him, Holland invoked his right to counsel and questioning ceased.

Detective Kevin Butler testified that on July 30, 1990, at 1:00 a.m., he contacted Holland in his cell at the Pompano Beach jail "to find out his name" because "[t]he name he had given we believed was false" after it didn't match up with any computer checks the police had run. Butler said he went into Holland's

---

[7] Holland moved to suppress the statements before his first trial. After a suppression hearing, the court ruled them admissible. Holland challenged this decision in his initial appeal, but the Florida Supreme Court did not reach the issue because it ordered a new trial on other grounds. Before his second trial, the State and Holland agreed to adopt the motions, responses, and evidence from the first trial on the issue, and Holland renewed objections to the statements when they were admitted at the second trial.

cell, identified himself, and "told him it was important . . . for him to tell the truth and just give us his real name so we know who he is." Butler explained that "I can't talk to you about what happened . . . you've already asked for an attorney." Butler said he was only there to establish Holland's "true identity." The petitioner stated that his name was Albert Holland. Butler said "okay, fine, I appreciate you being honest with me." According to Butler, he gave Holland his card and said "if you ever want to talk to me, you can call me." Then he left.

Detective Butler testified that another officer requested the jail to provide additional fingerprints and photographs under Holland's true name and that at 2:30 a.m. Detective Butler went to the booking room to pick up the fingerprints and photographs. Butler said that, while Holland was being booked, "[h]e looked over to me and he made eye contact with me, he nodded and he asked, he said, 'Can I talk to you?'" Butler replied, "Do you want to talk to me," to which Holland again said, "Yes, can I talk to you?" At that point, Butler took Holland to an interview room in the detective bureau. Butler said the first thing he told Holland was "Albert, you asked for an attorney and I can't speak to you." When Holland pressed on, Butler reiterated, "[t]he only reason I asked you to come in here was the fact that you wanted to talk to me. . . . If you still want to talk to me prior to doing that, I have to read the Miranda rights again." Butler read Holland his

54

<u>Miranda</u> rights from a form;[8] after each individual right, Holland replied "Yea."

At the end, Holland initialed his recorded responses seven times, signed the form, and said "I'll talk to you."  Holland then proceeded to make a series of incriminating statements.

The Florida Supreme Court rejected Holland's claim and found no <u>Miranda</u> violation because "[t]he record is clear that it was Holland, not Detective Butler, who initiated the conversation which ultimately resulted in the confession." <u>Holland II</u>, 773 So. 2d at 1074.  We agree with the district court that Holland does not satisfy § 2254(d) because this determination was objectively reasonable.

Under 28 U.S.C. § 2254(e)(1), we presume correct the Florida Supreme Court's findings of fact that "[t]he purpose of Detective Butler's contact with Holland was to ascertain his real name," "that it was Holland, not Detective Butler, who initiated the conversation which ultimately resulted in the confession," that "Holland specifically asked Detective Butler, 'Can I talk to you?'", that Butler "informed Holland of his <u>Miranda</u> rights . . . and clarified that Holland was willing

---

[8] The form asked Holland if he understood: Detective Butler was a police officer; Holland had the right to remain silent and refuse to answer questions; anything Holland said could and would be used against him in a court of law; Holland had the right to speak to an attorney before speaking to the police and to have an attorney present before questioning now or in the future; if Holland could not afford an attorney one would be appointed for him before any questioning if he wished; and if Holland decided to answer questions without an attorney present, he still had the right to stop answering at any time and speak to an attorney.  Each time, Holland responded "Yea."  When the form asked Holland if he had previously requested any law enforcement officer to allow him to speak to an attorney, Holland again said, "Yea."  Finally, the form asked Holland whether, "Knowing and understanding your rights as I explained them to you, are you willing to answer my questions without an attorney present?"  Holland replied, "I'll talk to you."

to talk without an attorney present," and that Holland "sign[ed] the waiver of Miranda rights form." Id. Holland does not attempt to rebut the presumption of correctness with clear and convincing evidence as required by § 2254(e)(1).

Instead of challenging the fact finding, Holland argues that the Florida Supreme Court acted contrary to or unreasonably applied Edwards v. Arizona, which held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." 451 U.S. at 484. "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Nevertheless, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." Miranda v. Arizona, 384 U.S. 436, 478 (1966).

Holland attacks the voluntariness of his interrogation statements from a number of unconvincing angles. He argues that Detective Butler's actions were designed to undermine Holland's right to counsel because establishing that Holland spoke English was incriminating. Holland highlights Butler's admonitions that it was important to tell the truth about his identity. According to

56

Holland, Butler intended to undermine his right to counsel by giving him his card and saying to call him if he wanted to talk. Holland also says that it was "highly suspicious" that he was brought out to be fingerprinted and photographed a second time, at 2:30 a.m., when Detective Butler "just happened" to be in the area. Finally, Holland claims that his statements should have been suppressed as involuntary because he was afraid of being beaten, was extremely tired, had vomited, and had ingested alcohol and cocaine.

The Florida Supreme Court reasonably found no Miranda violation when it concluded that Holland initiated the 2:30 a.m. dialogue with Detective Butler that drew out his incriminating statements. Holland's own testimony at trial shows his claim lacks merit: he said he had wanted to talk to Butler because he was the only person that Holland felt gave him "a chance to get out of the precinct," to "finesse my way out of there. That's what that whole thing is, me trying to talk to him, to hope that he gets me out of there." A court also could reasonably decide that the earlier act of handing over a business card was not something Butler should have known was reasonably likely to elicit an incriminating response, nor did the act apply undue pressure calculated to convince Holland to waive his rights.

## V.

In sum, the district court erred in ordering habeas relief on Holland's Faretta claim because the Florida Supreme Court reasonably concluded that his mental

57

condition kept him from making a knowing and voluntary waiver of the right to counsel.  Therefore, we reverse the grant of the writ of habeas corpus and remand with instructions for the district court to reinstate Holland's conviction and sentence.  However, we affirm the district court's denial of a habeas writ on Holland's three other appellate claims.

**AFFIRMED in part, REVERSED in part, and REMANDED with instructions.**